**FIRST DIVISION**
December 29, 2008

No. 1-07-1883

| | | |
|---|---|---|
| NATIVIDAD F. GARCIA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| v. | ) | |
| | ) | |
| WOOTON CONSTRUCTION, LTD., a | ) | |
| Corporation; | ) | No. 04 L 8684 |
| | ) | |
| Defendant-Appellee | ) | |
| | ) | |
| (Smithfield Properties Development, | ) | |
| L.L.C., a Limited Liability | ) | The Honorable |
| Company; Harris Management, Ltd., | ) | Kathy M. Flanagan, |
| a Corporation; and Zalk Josephs | ) | Judge Presiding. |
| Fabricators, L.L.C., a Limited | ) | |
| Liability Company, Defendants). | ) | |
| | ) | |

JUSTICE GARCIA delivered the opinion of the court.

The plaintiff in this construction negligence case, Natividad Garcia, injured his back while employed by JP Cullen & Sons, an ironworking subcontractor, doing work on a condominium project. The plaintiff appeals the grant of summary judgment in favor of the defendant, Wooton Construction, Ltd., the general contractor of the project. We are presented with two questions: (1) whether Wooton retained sufficient control over the work by Cullen to impose a duty of reasonable care under section 414 of

the Restatement (Second) of Torts (Restatement (Second) of Torts §414 (1965)) and (2) whether a material question of fact exists as to the proximate cause element of the plaintiff's negligence claim against Wooton. For the reasons that follow, we find the facts give rise to a duty of care and it is for a jury to decide the question of proximate cause. Accordingly, we reverse and remand.

## BACKGROUND

In August 2002, a condominium complex known as "Kingsbury on the Park" in Chicago was being developed. The property was owned by Smithfield Properties Development, L.L.C. Wooton Construction, Ltd., the general contractor, was a subsidiary of, or otherwise affiliated with Smithfield.

Wooton contracted with Zalk Josephs Fabricators, L.L.C., to fabricate structural steel. Zalk subcontracted with the plaintiff's employer, JP Cullen & Sons, to erect the steel.

Ross Nasca was Wooton's superintendent on the Kingsbury project; Bob Robertson was the head of Wooton's safety department and Harles Epps was Wooton's safety director. William Dohnke was Cullen's general foreman. Kary Eckhardt was Cullen's "raising gang" foreman and the plaintiff's direct supervisor. Rudy Saunders was the union steward.

Shortly before his lunch break on August 28, 2002, the

plaintiff, an ironworking apprentice with the Cullen raising gang, was in the process of unloading a crane basket containing approximately 10 kegs of bolts. Each keg weighed between 100 and 200 pounds. The plaintiff was standing inside the basket and was handing the kegs to another Cullen employee, Larry Dempsey, when the plaintiff felt something "pop" in his back and he experienced severe pain. He reported the injury to Dohnke.

On September 4, 2002, the plaintiff went to Northwestern Hospital and was eventually diagnosed with a herniated disc. The plaintiff underwent surgery to repair the herniated disc, but was not "cleared" by his doctor to return to ironworking.

On August 2, 2004, the plaintiff filed a one-count construction negligence complaint in the circuit court of Cook County, naming Wooton, Smithfield, and Harris Management, Ltd., as defendants. The plaintiff filed a first-amended complaint on September 20, 2005, adding Zalk as a defendant. Wooton, Smithfield, and Zalk filed a third-party complaint for contribution against Cullen on July 27, 2006.

On August 10, 2006, the plaintiff filed a second-amended complaint. The plaintiff alleged the defendants committed nine instances of negligence, only two of which are pertinent to the issues before us: (1) the defendants failed to provide a crane or other mechanical device to move the kegs of bolts and (2) the

**3**

1-07-1883

defendants permitted the plaintiff to move the kegs manually where they knew or should have known a crane or other device was necessary.

Ultimately, Wooton filed a motion for summary judgment.[1] Wooton contended it did not owe a duty to the plaintiff because it did not retain control over Cullen's work under section 414 of the Restatement (Second) of Torts. Wooton also argued the plaintiff could not establish its acts or omissions proximately caused the plaintiff's injury.

Amongst the evidence attached to Wooton's motion and the plaintiff's response are depositions from the plaintiff, Nasca, Dohnke, William Harris Smith, the president of Smithfield, and ironworkers Lawrence Dempsey, Michael Barrett, and Truman "Derrick" Keene III, all of whom were employed by Cullen. Also attached are the contract between Wooton and Zalk, the subcontract between Zalk and Cullen, and Wooton's "Sub-Contractor Safety Orientation Packet" (safety packet).

Section 2.1 of the Wooton-Zalk contract states that Zalk

---

[1] Smithfield and Zalk filed separate motions for summary judgment. Subsequently, the plaintiff voluntarily dismissed Smithfield. Zalk's motion was granted but is not raised on appeal.

1-07-1883

"shall perform and furnish all labor, supervision, services, appliances, materials, equipment, tools, scaffolds, hoisting, transportation, storage and all other things necessary to prosecute and complete the Work."  The agreement between Zalk and Wooton provided that a crane for subcontractor's use would be provided.  Section 2.7 provides that Zalk "agrees that the prevention of accidents to workers engaged upon or in the vicinity of the Work is its responsibility, even if [Wooton] establishes a safety program for the entire Project. Subcontractor shall establish and implement safety measures, policies and standards conforming to those required or recommended by governmental or quasi-governmental authorities having jurisdiction and by [Wooton] and [Smithfield]."

The Zalk-Cullen subcontract indicates Cullen is to "Furnish Supervision, Labor, Equipment, Consumable Materials, Electrical Power, Hoisting, and Rigging to unload and erect structural steel and Precast."  Cullen was not to furnish a crane.  Cullen also agreed to be bound by the Wooton-Zalk contract, which was incorporated into the subcontract.

Wooton leased the crane for the jobsite and, as acknowledged in Wooton's brief, "the general practice in the construction industry" is for the general contractor to have "ultimate control of job site cranes."  Cullen employees Lawrence Dempsey, William

**5**

Dohnke, Truman Keene and Michael Barrett in their depositions expressed dismay over Cullen not having exclusive use of the crane. Cullen did supply its own lifting basket and rigging for the crane.

Wooton's safety packet consists of 13 pages and contains 17 specific topics, including a dress code, protective equipment, "fall protection," and "general safety regulations." The safety packet generally provides the workers must wear shirts, long pants and work boots. They must utilize hard hats, protective eye wear, and, where necessary, earplugs. It also prohibits the use of illegal drugs, alcohol, firearms, and cameras. It directs how ladders and scaffolds are to be utilized and sets forth seven regulations regarding the use of "Cranes and Rigging," including that only authorized personnel may operate cranes and that the "Capacities of rigging equipment shall not be exceeded." The final page states the packet is "to be given to every employee prior to beginning work." It also states that employees are required to sign a form demonstrating "completion of the safety and health orientation." No employee may begin work prior to completing orientation.

Smithfield president, William Harris Smith, testified that Wooton's superintendent, Ross Nasca, was the highest-ranking Wooton employee on the jobsite daily. Nasca's duties included

being familiar with the daily progression of the job and making sure the work stayed on schedule.

Smith testified Wooton's safety packet was part of Wooton's overall safety plan. Wooton required each subcontractor to comply with the safety packet and OSHA regulations. Nasca had authority to require compliance with the safety packet and OSHA. If Nasca thought work was being performed unsafely, he had the authority to stop the work, but "[t]hat is all he would be authorized to do." He could keep the work stopped until the work could be completed safely.

Ross Nasca testified his duties as the superintendent included compiling the job schedule, monitoring the progress of the work, and ensuring the work stayed on schedule. Nasca testified that Wooton safety employees, Robertson and Epps, were responsible for placing the project safety packet in the hands of the foreman of each subcontractor. The foremen were expected to share the information with their employees. He described the packet as outlining "generic" rules Wooton thought to be important. Subcontractors were also required to hold weekly "toolbox talks," to discuss safety measures. The subcontractor foremen would decide the topic of the talks. Sign-in sheets for the talks were required to be given to Nasca.

If a subcontractor employee felt a work condition was

**7**

unsafe, he or she was free to talk to Nasca about the concern. Nasca would do what he could to remedy it.

Nasca explained there was only one crane available on the Kingsbury project. Wooton leased the crane, which was operated by employees of another company controlled by Smithfield. Nasca testified Cullen "controlled" the crane, but Nasca, as the superintendent, could make the crane available to other subcontractors. Nasca and Cullen would make decisions regarding the availability of the crane. Nasca explained:

> "[W]e gave them [Cullen] the crane with the idea that they had a hundred percent use of the crane; so whatever I would have to schedule as far as other subcontractors would have to be done, A, during their break, lunch period, or we would have to cover the premium time for our vendor as opposed to paying their raising gang. You know, if I take--if I was to theoretically take the crane away from them, now I have all their ironworkers, they're looking at me saying, well, you owe me for that. That's a path that's, you know, I would not go down."

According to Nasca, Cullen never complained about the

unavailability of the crane. Rather, the other subcontractors complained about Cullen having first priority.

Nasca also testified that the Cullen employees were responsible for their own safety. Nasca was not involved in how they "rigg[ed]" or lifted their bolts. He also did not direct the Cullen employees on how to move the kegs of bolts. "How they move their bolts around is up to them." However, Nasca had never seen kegs of bolts moved in any manner other than with a crane.

William Dohnke, Cullen's general foreman, testified that neither Nasca nor any other Wooton employee told the Cullen employees how to perform their jobs. However, Nasca could stop the work if he saw an unsafe practice or if the work did not match the project specifications.

Dohnke was required by Wooton and Cullen to complete weekly safety reports. Saunders, the union steward, also conducted weekly safety meetings. All ironworkers were required to attend but no minutes were kept.

Dohnke also testified about the crane. According to Dohnke, Wooton provided the "hook" but Cullen provided the "basket" and "chokers." Dohnke denied that Nasca limited other subcontractor's use of the crane to times when Cullen would not otherwise be using it. Dohnke testified that Nasca would take the crane away from Cullen without limitation. Nasca's taking of

the crane sometimes prevented Cullen from completing the crane-dependent work Cullen had started. Dohnke complained to Nasca about this practice on several occasions before the date of the plaintiff's injury. Dohnke told Nasca the unavailability of the crane was putting his employees' safety at risk.

On the day the plaintiff was injured, Nasca told Dohnke he was taking the crane but would return it after lunch. Dohnke did not know whether Nasca meant right after lunch or hours later. Because the crane was being taken, the plaintiff could not use the preferred, but more time-consuming, method of using a choker and the crane to unload the kegs from the basket. Instead, the plaintiff unloaded the kegs manually. This was done at the direction of Kary Eckhardt, the raising gang foreman. Eckhardt also directed the plaintiff to empty the basket before the lunch break.

The plaintiff testified in his deposition that Nasca never told him how to do his work but, on several occasions, stopped workers who were not properly tied-off. The plaintiff often saw Wooton's "safety person" on the jobsite. The person would regularly check to see that workers were wearing the necessary safety equipment and that they were "tied on." He attended weekly safety meetings that were conducted by his union steward.

According to the plaintiff, Nasca set a "crane schedule"

that would permit other subcontractors to use the crane while the Cullen employees were on a break, such as lunch. On the day of his injury, the plaintiff was manually unloading the kegs of bolts at the direction of his foreman, Kary Eckhardt. Eckhardt told the plaintiff to hurry and finish moving the kegs of bolts by lunch because another subcontractor needed to use the crane. The plaintiff would have preferred to "cinch" the kegs individually with the crane to unload them. This method involved less manual lifting, because the crane did the work, but took more time. According to the plaintiff, it is not unusual for an iron worker to have to lift a single keg of bolts, but it was unusual for a worker to have to unload multiple kegs from a crane basket. In his view, he would not have been injured if he had not been in a rush to finish emptying the basket by lunch.

Lawrence Dempsey was working with the plaintiff when he was injured. Eckhardt instructed that the basket had to be unloaded before lunch because another subcontractor needed the crane. Dempsey also explained the usual way to unload the basket was to use the crane to individually lift them out. However, Dempsey and the plaintiff were unloading it manually because they were in a hurry to finish before lunch. Dempsey testified it was "unusual" for the general contractor to supply the crane, which the Cullen raising gang needed to perform its work. Dempsey

testified that Nasca had "supreme say so" on the job. Although he had several conversations with Nasca, he did not recall whether Nasca ever told him how to do his job.

Derrick Keene testified that nobody from Wooton ever told him how to do his job. However, if Nasca would have told him to stop his work for a safety reason, Keene would have listened. According to Keene, the Cullen employees were not free to do their job in the manner in which they preferred when the crane was absent. Instead, they had to use unsafe practices contrary to their training. Prior to the plaintiff's injury, Keene complained to Nasca because the unavailability of the crane required Keene to manually move a 20-foot "perimeter angle." According to Keene, Nasca "blew off" his complaint.

Michael Barrett testified the customary way to unload a basket in the ironworking industry is to use a "choker" and a crane to lift the kegs individually. This was why ironworkers usually supplied their own cranes: so they could lift things safely. Wooton's control of the crane caused problems because Wooton would let other subcontractors use it. When this happened, the Cullen employees either had to manually lift items or risk being "shut down." That the crane was unavailable at times was a problem for Cullen during the whole job. Screaming matches between the employees from Cullen and the employees from

**12**

Wooton would often result.

Barrett testified he was "working the phones" with the crane operators on the day the plaintiff was injured. He was about 10 feet from the plaintiff and also near Nasca and Eckhardt. Barrett heard Nasca tell Eckhardt that Wooton was taking the crane. "[Q]uite a few swear words" and "an argument" resulted. In response to Eckhardt's protests, Nasca told him that the Cullen employees would have to "lift the stuff manually" because he was pulling the crane.

The trial court granted Wooton's motion for summary judgment, finding Wooton retained only a general right of supervision, which was insufficient to invoke a duty of care under section 414. Without explaining its reasoning, the court also found the plaintiff failed to present evidence to establish proximate cause. This timely appeal followed.

### ANALYSIS

Summary judgment is proper if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006); Purtill v. Hess, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986). Wooton, as the moving and successful party on the summary judgment motion, does not

**13**

(and cannot) challenge the facts in this case as presented to the circuit court below, as summary judgment "is not designed to try an issue of fact, but rather to determine whether one exists." Rivan Die Mold Corp. v. Stewart Warner Corp., 26 Ill. App. 3d 637, 640-41, 325 N.E.2d 357 (1975). We construe what is contained in the papers on file most liberally in favor of the opponent. Rivan Die Mold Corp., 26 Ill. App. 2d at 640. "If, from a review of the pleadings and evidentiary material before the trial court, a reviewing court determines that *** the summary judgment was based upon an erroneous interpretation of the law, a reversal is warranted." Pagano v. Occidental Chemical Corp., 257 Ill. App. 3d 905, 909, 629 N.E.2d 569 (1994).

In its written order granting summary judgment, the trial court gave two grounds. First, Wooton owed no duty of care to the plaintiff. See Rangel v. Brookhaven Constructors, Inc., 307 Ill. App. 3d 835, 838, 719 N.E.2d 174 (1999). Second, in any event, the plaintiff could not show that his injury was proximately caused by Wooton's alleged breach of its duty of care. See City of Chicago v. Beretta U.S.A. Corp., 213 Ill. 2d 351, 395-96, 821 N.E.2d 1099 (2004) ("the lack of proximate cause may be determined by the court as a matter of law where the facts" are legally insufficient). Our review is de novo. Purtill, 111 Ill. 2d at 240.

**14**

## I. Duty

The general rule is that one who employs an independent contractor is not liable for the independent contractor's acts or omissions. Section 414 provides an exception to this general rule.

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts §414, at 397 (1965).

This exception, known as the "retained control exception," was recognized by our supreme court in Larson v. Commonwealth Edison Co., 33 Ill. 2d 316, 211 N.E.2d 247 (1965). In order for this exception to apply, it must be shown that the general contractor retained sufficient control over the work of the subcontractor so that the law recognizes the existence of a duty to exercise that "supervisory control with reasonable care." See Aguirre v. Turner Construction Co., 501 F.3d 825, 831 (7th Cir. 2007) (duty of care arose where "specific alternative design

**15**

requirements on the scaffold from which [the plaintiff] fell" were imposed by general contractor). Whether Wooton retained a level of control sufficient to give rise to a duty of reasonable care is a question of law. Rangel, 307 Ill. App. 3d at 837.

At oral argument, the plaintiff made clear that his negligence claim is based on comment *c* of section 414 where a duty of care is recognized when a general contractor "retained *** some degree of control over the manner in which the work [of the subcontractor] is done." Restatement (Second) of Torts §414, Comment *c*, at 388 (1965). In essence, the plaintiff contends a sufficient degree of control over the work by Cullen was exercised by Wooton's control over the only crane available at the work site. The Cullen raising gang, of which plaintiff was a part, required the use of a crane to perform its work. The contract between Wooton and Zalk, which was incorporated into the contract between Zalk and Cullen, expressly provided that Wooton would provide the crane and, in accordance with industry practice, would control its use. Dempsey, from the Cullen raising gang, testified it was unusual for Cullen not to have provided its own crane.

We understand the gravamen of the plaintiff's claim to be that Wooton, in controlling the use of the crane, had a duty to exercise reasonable care in taking the crane from use by Cullen.

**16**

In other words, before Wooton removed the crane from the Cullen raising gang, Wooton had a duty to ensure that the raising gang had completed its crane-dependent work. More specifically, because the safe and customary practice in the steel raising industry was to use the crane to remove multiple kegs of bolt from a transporting basket, Wooton should have made clear at the time it announced the "taking" of the crane, that Cullen complete the unloading of the basket with the crane before relinquishing the crane to Wooton. With Wooton assuming control over the only crane at the work site and in light of the conceded need for the use of the crane for the raising gang to perform its work, it follows that Wooton retained some degree of control over the manner in which the work of the Cullen raising gang was done. See Restatement (Second) of Torts §414, Comment *c*, at 388 (1965). Our conclusion is amply supported by the facts in the record.

Dempsey testified that Nasca had "supreme say so" on the job. Nasca testified that Wooton, as the general contractor, in line with industry practice, controlled the use of the crane. Dohnke told Nasca that the unavailability of the crane was putting his employees' safety at risk. According to Keene, he complained to Nasca that the unavailability of the crane forced him to move a 20-foot "perimeter angle" manually but that Nasca "blew off" his complaint. Nasca himself testified that he had

**17**

never seen kegs of bolts moved manually, but he had never seen more than one moved in any manner other than with a crane. As Wooton acknowledges in it brief, it is "standard practice in the steel erection industry to load and unload kegs of bolts with the use of a crane." Nasca also admitted that the Cullen raising gang required the use of a crane to do its work.

Just prior to the incident involving the plaintiff, Nasca told Dohnke, Cullen's general foreman, that Wooton was taking the crane and would return it after lunch. It appears Dohnke conveyed Nasca's intention to take the crane to Eckhardt, Cullen's raising gang foreman, who in turn directed the plaintiff and Dempsey to manually unload the basket full of kegs of bolts to relinquish the crane quickly to Wooton. Consistent with the industry standard, the preferred, but more time-consuming, method of unloading kegs of bolts is by use of a choker and crane. Nasca did not condition his taking of the crane on completing the unloading of the basket in line with the safe and preferred method by use of the crane. In the course of unloading the basket, after it appears several kegs had been lifted out of the basket by the plaintiff, the plaintiff suffered the herniated disk.

Given that Wooton had "supreme say so" over the use of the crane, and that Wooton told Cullen that it was taking the crane

**18**

after Wooton through Nasca had been told that the Cullen raising gang was forced to engage in unsafe practices when the crane was unavailable, it was foreseeable that Cullen would direct that the unloading of the basket full of kegs of bolts be done in a manner that would provide the crane to Wooton in as short a time as possible, that is, by manually unloading the basket, rather than taking the safer but more time-consuming method of using the choker and crane.

Wooton's control over the use of the crane--equipment that all acknowledge the raising gang needed to perform its work-- supports a finding that Wooton had a duty of care to reasonably exercise its control over the use of the crane so as not to expose the raising gang to foreseeable danger of harm. Wooton's control over the use of the crane is not unlike the alternative design of scaffolding imposed by the general contractor in Aguirre. In Aguirre, the scaffolding used by the plaintiff and from which he fell, was constructed in accordance with "specific alternative design requirements" imposed by the general contractor. Aguirre, 501 F.3d at 831. In effect, the general contractor controlled the subcontractor's "means and methods of doing it work" by directing that the subcontractor do its work with scaffolding devised by the general contractor. Here, Wooton controlled the "means and methods" of the work contracted

**19**

to be done by the Cullen raising gang, by Wooton depriving Cullen of the use of the crane to do crane-dependent work. See Bokodi v. Foster Wheeler Robbins, Inc., 312 Ill. App. 3d 1051, 1059, 728 N.E.2d 726 (2000) (general contractor should have been aware of the unsafe, manual hoisting method being used by the plaintiff to lift the metal sheets).

The circumstances leading to the injury sustained by the plaintiff in unloading the kegs of bolts manually are not unlike the circumstances leading to the injury to the plaintiff in Bokodi. In Bokodi, the plaintiff, a subcontractor employee, sued the general contractor after he injured his back lifting sheets of metal siding. Although the plaintiff would have preferred to use a mechanical device to lift the metal sheets, he used a "manual well wheel and handline" at the time of his injury. Bokodi, 312 Ill. App. 3d at 1054. In Bokodi, we found the contractual language and the general contractor's actions demonstrated sufficient control to trigger a duty of care under section 414. In that case, the general contractor held weekly safety meetings and had the authority to stop a subcontractor's work if an unsafe practice was suspected. Further, the contract between the general contractor and the subcontractor required the subcontractor to comply with 29 specific safety measures and the general contractor hired a full-time safety manager to

**20**

ensure the subcontractor's compliance.  We emphasized that the general contractor should have been aware of the unsafe, manual hoisting method being used by the plaintiff to lift the metal sheets.  Bokodi, 312 Ill. App. 3d at 1063.  We concluded the general contractor "went to great lengths to control the safety standards at the work site," despite contractual language that indicated the subcontractor was to maintain control of its work and the safety of its employees.  Bokodi, 312 Ill. App. 3d at 1063.  The evidence of Wooton's control over the means and methods of the Cullen raising gang's work is considerably stronger than the control exerted by the general contractor in Bokodi.

Here, direct evidence was presented of Wooton's exercise of control over the unloading of the kegs of bolts by the plaintiff.  Barrett testified that Wooton through Nasca directed that the basket full of kegs of bolts be unloaded manually.  While Barrett's version of the conversation between Wooton and Cullen may stand alone among those within earshot of that conversation, at this junction we take the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the plaintiff.

Based on the facts in the record, we conclude, as the court did in Aguirre, that the general contractor, Wooton, "retained

**21**

sufficient control over the safety of [the crane-dependent work] and construction to give rise to a duty of reasonable care under section 414 of the Restatement. Of course, this holding does not mean [Wooton is] liable for [the plaintiff's] injuries; [the alleged breach of that duty] remains a question for the jury." Aguirre, 501 F.3d at 831.

We find the cases on which Wooton primarily relies, Rangel, Shaughnessy v. Skender Construction Co., 342 Ill. App. 3d 730, 794 N.E.2d 937 (2003), and Martens v. MCL Construction Corp., 347 Ill. App. 3d 303, 807 N.E.2d 480 (2004), to be distinguishable on their facts. In Rangel, we affirmed summary judgment in favor of the general contractor because there was no evidence the general contractor constructed the scaffolding from which the plaintiff fell. In fact, the evidence was that only the subcontractor controlled the use of the scaffolding and that the subcontractor told the plaintiff to use the scaffolding in an unsafe manner. Rangel, 307 Ill. App. 3d at 839. In Shaughnessy, the plaintiff fell after a rotten wooden board he used as a "bridge" over a gap broke. The evidence showed the subcontractor had furnished its own equipment, including a more safe way for the plaintiff to perform his work. No evidence was presented that the general contractor was aware of the unsafe practice the plaintiff undertook. Shaughnessy, 342 Ill. App. 3d

**22**

at 738. In Martens, the plaintiff was injured in a fall. His claim of negligence against the general contractor was one of "failing to provide fall protection." Martens, 347 Ill. App. 3d at 306. The plaintiff never presented any facts to connect his falling to any control, either by contract or by "operational control," exercised by the general contractor. Martens, 347 Ill. App. 3d at 318-20. Accordingly, we reject Wooton's position that this case is more like Shaughnessy, Martens, and Rangel than like Aguirre and Bokodi.

We reverse the trial court's determination that the facts in this case did not give rise to a duty of care on the part of Wooton owed to the plaintiff.

## II. Proximate Cause

A plaintiff in a negligence case must present some evidence that the defendant's alleged negligence proximately caused his or her injury. Harrison v. Hardin County Community Unit School District No. 1, 197 Ill. 2d 466, 476, 758 N.E.2d 848 (2001). Wooton's only contention regarding a showing of proximate cause is that it was Eckhardt that directed the plaintiff to unload the basket manually. This is true, but Wooton fails to consider that the chain of events that resulted in the injury to the plaintiff began with Wooton's demand that Cullen relinquish control of the crane. We reject Wooton's contention that as a

**23**

matter of law, a finder of fact could not find Wooton, as the agent that put in motion the chain of events at issue, to have proximately caused the plaintiff's injuries. See Espinoza v. Elgin, Joliet & Eastern Ry. Co., 165 Ill. 2d 107, 118, 649 N.E.2d 1323 (1995) (the facts of the case were not "sufficiently one-sided" that the court could determine the issue of proximate cause as a matter of law); Pasko v. Commonwealth Edison Co., 14 Ill. App. 3d 481, 490, 302 N.E.2d 642 (1973) ("evidence supports the submission to the jury the question" of the defendant's negligence).

The plaintiff presented sufficient evidence to support his claim that he would not have lifted the kegs manually but for Wooton's control over the crane, which it sought to take from Cullen to give to another subcontractor. Dohnke and Barrett both testified that Nasca was aware that the Cullen raising gang engaged in unsafe practices when the crane was unavailable, and Barrett testified that Nasca told Eckhardt that the Cullen employees would have to "lift the stuff manually."

The trial court erred in granting summary judgment on the element of proximate cause.

## CONCLUSION

For the reasons stated above, we reverse the trial court's grant of summary judgment and remand this matter for further

**24**

1-07-1883

proceedings.

Reversed and remanded.

R. GORDON, P.J., and WOLFSON, J., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**

---

**NATIVIDAD F. GARCIA,**
      **Plaintiff-Appellant,**

**v.**

**WOOTON CONSTRUCTION, LTD., a Corporation;**
      **Defendant-Appellee**

**(Smithfield Properties Development, L.L.C., a Limited Liability Company; Harris Management, Ltd., a Corporation; and Zalk Josephs Fabricators, L.L.C., a Limited Liability Company, Defendants).**

---

**No. 1-07-1883**

**Appellate Court of Illinois**
**First District, First Division**
**Filed: December 29, 2008**

---

**JUSTICE GARCIA delivered the opinion of the court.**

**R. GORDON, P.J., and WOLFSON, J., concur.**

---

**Appeal from the Circuit Court of Cook County**
**Honorable Kathy M. Flanagan, Judge Presiding**

---

For PLAINTIFF-APPELLANT

Daniel V. O'Connor
Jeffrey S. Jordan
ANESI, OZMON, RODIN, NOVAK &
KOHEN, LTD.
161 North Clark Street, 21st Floor
Chicago, IL 60601

For DEFENDANT-APPELLEE

Stephen A. Rehfeldt
MULHERIN, REHFELDT &

1-07-1883

VARCHETTO, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187

27