# Illinois Official Reports

## Appellate Court

---

### *Cain v. Joe Contarino, Inc.*, 2014 IL App (2d) 130482

---

| | |
|---|---|
| Appellate Court Caption | JEFFREY CAIN, Plaintiff-Appellant, v. JOE CONTARINO, INC., Indiv. and d/b/a Contry Homes, Inc., of Illinois, Defendant-Appellee (Harvest Glenn LLC, Defendant). |
| District & No. | Second District<br>Docket No. 2-13-0482 |
| Filed | April 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries plaintiff suffered while setting trusses on a house being constructed by his employer, the subcontractor, summary judgment was properly entered for defendant, the general contractor, since the general contractor had no duty of care under the retained control exception set forth in section 414 of the Restatement (Second) of Torts, and any such duty of care did not require defendant to provide a crane to perform the work of setting the trusses; furthermore, plaintiff's claim that defendant owed its invitees a common-law duty of reasonable care as an owner or possessor of the land was rejected on the grounds that the land was not owned by defendant at the time of plaintiff's injury, and although defendant had access to the property, there was no indication defendant had the ability to exclude others or regulate others' use of the property. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 08-L-257; the Hon. J. Edward Prochaska, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Sean P. Murray and Melanie J. VanOverloop, both of Anesi, Ozmon, Rodin, Novak & Kohen, Ltd., of Chicago, for appellant.

G. Christopher Slick and Mark C. Galasso, both of Tribler, Orpett & Meyer, P.C., of Chicago, for appellee.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Zenoff and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff, Jeffrey Cain, appeals from the trial court's grant of summary judgment in favor of defendant, Joe Contarino, Inc., d/b/a Contry Homes, Inc. (CH), on plaintiff's complaint alleging CH's negligence in connection with a construction accident that injured plaintiff. For the following reasons, we affirm.

¶ 2                     I. BACKGROUND

¶ 3     The materials submitted with the summary judgment filings disclose the following basic facts. Plaintiff's injury occurred on August 25, 2006, while he was performing carpentry work for his employer, Hawkins Construction (HC). HC was framing a single-family home on lot 407 in the Harvest Glenn subdivision (407 Harvest Glenn) in Davis Junction, Illinois. The work was subcontracted to HC by CH, the general contractor. At the time of construction, the homesite was owned by Harvest Glenn LLC, which was originally named in the action along with CH. Harvest Glenn LLC was owned by Joe Contarino and two other individuals. Contarino also owned CH.

¶ 4     The incident occurred while plaintiff and his coworkers were setting roof trusses on the garage at 407 Harvest Glenn. Plaintiff and the others were raising and positioning the trusses by hand, without machinery such as a crane. Two men stood opposite each other on the tops of the garage walls (the top plates) while plaintiff stood "in the webbing," *i.e.*, he secured himself by standing on previously secured trusses, while receiving new trusses. Trusses were handed up one at a time from outside the garage walls to one of the men standing on the top plates. That man, with plaintiff's assistance, guided the truss across the expanse of the garage to the man standing on the top plate opposite. Plaintiff fell when the truss on which he had secured himself became loose. The deposed witnesses disagreed as to how the truss became loose. The majority account was that one of the trusses plaintiff was receiving struck and dislodged the board that was bracing the truss on which plaintiff stood. The minority account was that the bracing board broke off because plaintiff was leaning too heavily on the truss on which he was

standing. In any case, plaintiff fell to the ground and was seriously injured. He was wearing no safety harness, nor was the crew using any safety scaffolding.

¶ 5 Before proceeding further with the backdrop of this appeal, we note that CH has filed a motion to strike that portion of plaintiff's reply brief in which he contends that HC's practices at the worksite on the day of the injury violated the Occupational Safety and Health Act (OSHA) (29 U.S.C. § 651 *et seq.* (2006)). For the reasons stated below (*infra* ¶¶ 45-58), we grant the motion and strike plaintiff's contention insofar as he relies on OSHA.

¶ 6 Following his injury, plaintiff filed a four-count complaint in negligence against CH and Harvest Glenn LLC. Counts I and II named CH, and counts III and IV named Harvest Glenn LLC. Subsequently, the trial court granted summary judgment in favor of Harvest Glenn LLC on both counts against it. In the two counts against CH, plaintiff alleged separate bases on which to find that CH owed plaintiff a duty of care even though CH was not his employer. In count I, plaintiff alleged that CH had a duty of care toward plaintiff because CH

"coordinat[ed] the work being done and designated various work methods, maintained and checked work progress[,] and participated in the scheduling of the work and the inspection of the work. In addition, *** [CH] had the authority to stop the work, refuse the work and materials and order changes in the work, in the event the work was being performed in a dangerous manner or for any other reason."

¶ 7 In count II, plaintiff alleged that a duty of care arose because CH "possessed, operated, managed, maintained and controlled or had a duty to possess, operate, manage, maintain and control, both directly and indirectly, *** [the] building under construction" at 407 Harvest Glenn.

¶ 8 In both counts, plaintiff made the general allegation that CH breached its duty of care by failing to ensure that HC maintained safe work practices at the jobsite. Plaintiff also included the specific allegation that CH was negligent for failing to provide HC a scaffold or a "crane or other hoisting device."

¶ 9 Although plaintiff's complaint cited no authority, in subsequent proceedings he invoked two sections of the Restatement (Second) of Torts. As authority for count I, plaintiff cited section 414 of the Restatement, according to which a general contractor that retains control over the work of its subcontractor is liable for injuries caused by the general contractor's failure to exercise that control with reasonable care. See Restatement (Second) of Torts § 414 (1965). For count II plaintiff relied on section 343 of the Restatement, which imposes liability upon a possessor of land for injuries to an invitee caused by the possessor's failure to exercise reasonable care in protecting the invitee from a dangerous "condition on the land." See Restatement (Second) of Torts § 343 (1965). Both sections have been adopted by our supreme court and so govern negligence actions in Illinois. See *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 468 (1976) (section 343); *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325 (1965) (section 414).

¶ 10 CH moved for summary judgment on both counts, arguing that (1) it did not retain control over HC's work sufficient for a duty under section 414 to arise; (2) it was not, for purposes of section 343, a possessor of the land upon which the accident occurred; and (3) the manner in which the trusses were raised did not constitute a "condition on the land" per section 343. Plaintiff filed a response in opposition. The parties attached several depositions to their filings. In addition, plaintiff submitted the affidavit of Stephen Fournier, who identified himself as a construction safety consultant. Fournier averred that he had reviewed the depositions taken in

- 3 -

the case as well as the "entire file[s] produced by [CH] and [HC] including the photographs, contracts, invoices, safety materials, OSHA materials, manuals and related documents." Fournier proceeded to offer multiple opinions on CH's duties at the jobsite. As the bases for his opinions, Fournier cited mostly "industry customs and practices" and CH's own "actions and customs and practice[s]," yet he never specified their content.

¶ 11    CH moved to strike Fournier's affidavit as out of compliance with Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013), because it specified no facts and offered merely conclusions. The trial court agreed with this assessment of the affidavit and struck it.

¶ 12    There are depositions in the record from (1) plaintiff; (2) Contarino; (3) Lloyd Hawkins, owner of HC; (4) HC employees Nathan Taylor, Joe Jarman, Bobby Steines, and Charles Miller; and (5) CH employees John Knabe and Joshua White. Also in the record is a "Master Construction Subcontract Agreement" (Agreement) signed in November 2005 by Contarino and Hawkins on behalf of CH and HC, respectively. The contract term is October 1, 2005, through September 30, 2006 (plaintiff was injured in August 2006). The Agreement designates CH and HC as "Contractor" and "Subcontractor," respectively. The Agreement specifies no particular job, but defines "Work" and "Project" to include all work or projects on which the parties orally agree during the contract term. The two sections most material here are as follows:

> "Section 4.00. SAFETY. Subcontractor, its subcontractors, agents, and employees shall be fully and solely responsible for the jobsite safety at the Project.

> Section 5.00. CONTROL OF THE WORK. With respect to the Subcontractor's own Work, the Contractor shall not have contractual, operational and/or supervisory control over and/or charge of the Work and shall not be responsible for construction means, methods, techniques, sequences, procedures, operative details and incidental aspects of the Subcontractor's Work, or for safety precautions, equipment, procedures and programs in connection with the Subcontractor's Work, since these are solely the Subcontractor's responsibility under the Agreement."

¶ 13    Also, under a section entitled "Indemnification," the Agreement states: "Subcontractor agrees that it is solely responsible for compliance with [OSHA] and the Construction Safety Act of 1969 [(CSA) (40 U.S.C. § 333 *et seq.* (2000) (now Contract Work Hours and Safety Standards Act (40 U.S.C. § 3704 *et seq.* (2006))))]."

¶ 14    Most of Hawkins' and Contarino's testimony about the relationship between CH and HC was not specifically in reference to the Agreement, but rather seemed to address the parties' customs in their longtime business relationship. Hawkins testified that he founded HC in 1989 and that HC's business was the rough framing of residential homes. HC first performed subcontract work for CH in 1991. From 1991 through 2006, the year of the accident, at least 90% of HC's work was for CH. Hawkins could recall signing no contracts with CH prior to the Agreement. Hawkins interpreted the Agreement to mean that CH would "not have any control over how [HC] would perform [its] work" and that "all safety at the jobsite was the responsibility of [HC]." Hawkins asserted that the Agreement did not change his view of HC's business relationship with CH and that HC operated with CH the same as before. According to Hawkins, the Agreement's vesting HC with sole responsibility for worksite safety was consistent with HC's prior business relationship with CH. With other general contractors as well, HC was solely responsible for worksite safety. Hawkins testified that, after the accident,

HC continued to work for CH until 2007, when CH's business slowed and there no longer was work for HC.

¶ 15    Asked to describe how CH and HC operated together, Hawkins explained that CH would provide plans for a home and that HC "was responsible for how [it] decided to put that home up." CH employed "expediters" whose only responsibilities were to ensure that the subcontractor had adequate materials for the job, was working on schedule, and was completing the project "pursuant to specifications." The expediters never prescribed for HC the "means" or "methods" of its work. Hawkins assumed that if an expediter saw "something not right" he would say so, but Hawkins could recall no occasion when an expediter identified anything "not right" with HC's work. When asked if CH's subcontractors were "free to work in any way they want[ed] to" or were required to "follow *** the work order that [CH] wishe[d] to be done," Hawkins answered, "No[.] *** There's [*sic*] guidelines." Hawkins was not asked to specify what guidelines he had in mind aside from the "work order" submitted by CH. Later in his testimony, Hawkins affirmed that CH had no "safety guidelines" for HC to follow.

¶ 16    Plaintiff's argument on appeal relies heavily on certain testimony from Hawkins as to CH's authority over HC. We quote that testimony at length here:

"Q. Joe Contarino could fire [HC] if he wasn't satisfied with your work, correct?

A. Correct.

Q. If Joe thought you weren't working safely, he could stop your work; is that true?
***
A. Yeah, he could–he was, yeah.

Q. As a general contractor, he had that authority, correct?
***
A. Correct.

Q. If Joe disagreed with the way that [HC] was going about doing their work, he could stop [HC's] work; is that correct?
***
A. Correct.

Q. *** If Joe Contarino ordered that [HC] use a crane on each and every home, would you have done that?

A. Yes.

Q. He had authority to do that, correct?

A. Yes.

Q. If Mr. Contarino had ordered that scaffolding be used on the outside of the walls by the men who were standing over there setting the trusses, would you have had to follow that direction?

A. If there was [*sic*] guidelines set forth, I follow the guidelines.

Q. And if those–if [CH's] guidelines included setting scaffolding on the outside of those walls, that would be something you would have to follow; is that true?

A. Yeah."

¶ 17       Hawkins immediately added, however, that HC would probably *not* use scaffolding where "it would take more time to set up" the scaffolding "than it would just to go and do the trusses." Hawkins explained: "Just because *** there's a rule, doesn't mean I'm going to follow it." Hawkins would have HC use scaffolding only because he "wanted to keep working for [CH]" and "wanted to keep [Contarino] happy." There was a similar tenor to this subsequent exchange:

      "Q. *** It was within [CH's] authority to direct [HC] to put up a lifeline if [CH] wanted to; is that correct?

      A. He [Contarino] could have suggested, but just not meaning I would have followed.

      Q. Well, if you don't–

      A. You know, until you–you got to do this or I'm gonna, you know, have to get rid of you. It was like driving down the highway, the speed limit is 55, if you do 65, you're breaking the rule, you know.

      Q. Well, you don't have a contract with the speed limits, right?

      A. Yeah.

      Q. In this particular job, you had a contract with a general contractor, and were performing work for him, correct?

      A. Correct.

      Q. And with that contract comes certain authorities for the general contractor, true?

      A. Correct.

      Q. And certainly the general contractor has authority to tell you to do certain things if they want those things done, correct?

      A. Yes.

      Q. And within those authorities, the general contractor has the authority to tell [HC], if they want to, to take certain safety measures; is that true?

      A. That's true.

      Q. And within those safety measures, if [CH] wanted [HC] to put up a lifeline system, that's something that [HC] would have to do, correct?

      A. Correct."

¶ 18       The subject was broached again later:

      "Q. We talked earlier about [CH] being the entity that hired [HC] and having certain authorities; do you remember that discussion?

      A. Yeah.

* * *

      Q. If [CH], as the general contractor, had directed that [HC] use different methods or procedures for those roof trusses, you would have followed that, correct?

      A. Correct."

¶ 19       Hawkins testified that, at some point prior to the accident, CH asked all foremen of its framing subcontractors to attend an OSHA class. CH paid for the class, which Hawkins attended. Based on information he received at the class, Hawkins ensured that open windows and staircases were boarded up at 407 Harvest Glenn.

¶ 20 Consistent with Hawkins, Contarino testified that, generally, the job of CH's expediters was to make sure that subcontractors had adequate materials, worked according to schedule, and completed the project according to specifications. Expediters "would not advise or instruct any contractor how to perform their work on *** projects." Contarino agreed that, "pursuant to the Agreement, [CH] did not have the right to do that" with respect to HC's work. Contarino also affirmed, however, that CH could "fire" a subcontractor if CH were not "happy with what [it] [was] doing." On the issue of worksite safety, Contarino noted that CH had no safety guidelines of its own that it imposed on subcontractors. CH expected its subcontractors to abide by OSHA, and when, in the past, they were fined under OSHA, CH reminded them that compliance was their responsibility. Accordingly, if Contarino learned that HC was violating OSHA, he would tell Hawkins "that he is responsible to work in accordance to OSHA, and [that] he knows that per our contract with them." Per the Agreement, Contarino expected HC to obtain and use all necessary safety equipment, including fall protection.

¶ 21 Hawkins and Contarino were also queried on whether a crane was available for the truss work on 407 Harvest Glenn and whether a crane would have made the work safer. Hawkins shared his understanding of how plaintiff fell, which, because he was not present during the accident, he gathered from eyewitnesses. Plaintiff and his coworkers were setting trusses on the garage at 407 Harvest Glenn when the accident occurred. According to Hawkins, plaintiff fell because the truss that he was receiving struck the lath, or bracing, board securing the truss on which he was standing. Hawkins explained that a lath board is attached near the peak of each truss as it is placed into position. A lath board typically runs across more than one truss, which can result in overhang beyond the trusses already set in place. To ensure that new trusses did not strike the overhanging portion as they were set in place, the board should have been placed on the peak opposite the side from which the trusses were slid across the expanse of the garage. According to Hawkins, plaintiff at one point mistakenly placed the lath board on the peak nearest the side from which the new trusses were raised. The next truss that was raised struck and dislodged the overhanging lath board, destabilizing the truss on which plaintiff was standing.

¶ 22 Hawkins asserted that HC had full discretion to use a crane on any home it framed for CH and that CH would pay for the crane. Hawkins testified that he himself made the decision not to use a crane to set trusses on 407 Harvest Glenn. Hawkins "talked to [his crew] and said, 'We won't be getting the crane on this house, we can pull.' " According to Hawkins, "[e]veryone was in agreement." Hawkins stated that 407 Harvest Glenn, being a single-story home with 1,232 square feet, was not the kind of structure on which HC would typically use a crane to set trusses. Depending on the grade of the lot, however, a crane might be used even on such a home.

¶ 23 Hawkins acknowledged that a crane can be used to maneuver a truss under an overhanging lath board. In that respect, a crane "could have been used as a safety measure to avoid [the] accident."

¶ 24 According to Contarino, a crane is necessary to set trusses on a two-story home, but for a one-story home the necessity of a crane depends on such factors as the height and pitch of the trusses. HC had discretion to order a crane for a single-story home, and CH would pay for it. Contarino asserted that CH never denied a subcontractor's request for a crane.

¶ 25 Deposition testimony about the relationship between CH and HC also came from the members of HC's crew who were working at 407 Harvest Glenn on the day of the accident.

The crew included plaintiff, Taylor (the foreman), Steines, Jarman, and Miller. Taylor, Steines, and Jarman all agreed that CH would provide plans and specifications for jobs but never dictated to HC the means or methods of its work. Moreover, all agreed that HC received no direction from CH on matters of safety.

¶ 26    Consistent with these witnesses' testimony, plaintiff admitted that he never observed anyone from CH "instruct [plaintiff] or anyone at [HC] as to the means and methods of how to perform the work of [HC]." He also admitted that he never observed CH conduct safety meetings or give safety directions on the worksite and that he was unaware of any safety guidelines issued by CH. Rather, plaintiff believed, based on his own experiences as a general contractor, that the subcontractor "is doing exactly what he's being told by the general contractor" and that "any work that's performed is performed by how the general contractor wants it done." Plaintiff also believed that CH could have halted HC's work if it disagreed with HC's means or methods and then "order [HC] to do [the work] in a different manner." Plaintiff acknowledged, however, that his conception of CH's scope of authority was based on industry custom and that he had never seen the Agreement.

¶ 27    Also on the subject of what CH *could* have required HC to do, Taylor opined that, since Contarino owned the property, he had "ultimate control," *i.e.*, "control over everything that happens," and so had "authority to tell [subcontractors] what to do." Taylor admitted, however, that he was unaware of what CH's "legal duties, obligations or authorities were" in relation to HC.

¶ 28    Miller testified that CH expediters would not tell a subcontractor "exactly how to do [its] work." He immediately added, however, that CH "had specific ways to level out walls." He said:

> "They had to have an eight-foot level to run across your wall to make sure that it planed all properly so they could drywall it and there wouldn't be any bumps. They wanted that specific stuff done.
>
> Q. So [CH] wanted the walls to be level?
>
> A. Yes. Per their way, you know, yes.
>
> * * *
>
> Q. Earlier you talked about you believed there was a requirement that the walls be leveled a certain way?
>
> A. Yes.
>
> Q. Is that something you heard directly from an expediter or is that something that Lloyd Hawkins told you that is what we do on these projects for [CH]?
>
> A. [Hawkins] told us, who was told by [CH], that that is how they wanted their walls leveled.
>
> Q. Would you agree–
>
> A. (Interrupting) Because if the boards were bowed, they wanted us to cut into the studs and then put a nail drive in to get them flat so that drywall wouldn't bubble up.
>
> Q. When you say 'they,' that is the instruction that you would receive from [Hawkins] that you believe would have come from [CH]?
>
> A. Yes, that's right.
>
> Q. But nobody from [CH] told you specifically to do that?

A. I think there was one old man that used to be there that would–that might have said that once or twice.

Q. That would have been before this project, correct?

A. Yes, before this project.

Q. Would have been a completely separate project?

A. It was–what is that?

Q. Completely different development?

A. I think this older gentleman, he was an expediter. He may have had a different subdivision. I don't remember. We jumped around a lot in subdivisions."

Miller testified that he was certain the expediter he referenced was from CH.

¶ 29 Miller was asked later about the wall-leveling requirement:

"Q. The only specific responsibility or issue relative to that responsibility that you heard [Hawkins] say came from [CH] was how to level to make sure the walls were level?

* * *

A. *** I just remember the one specific incident where the guys were told how to level walls and how to cut them and get them level. That is–you know, that was the only–because I always thought it was stupid is [*sic*] how they wanted it done, but that is–that's the only specific incident that I have in my memory.

Q. That's not directly from anyone from [CH]?

A. I think it was from [its] expediter.

Q. That is not something from [CH] that you witnessed? That is something that you are testifying that [Hawkins] told you someone from [CH] told him to do it that way?

A. This was a guy from [CH] that told us how to do it. That was in one house specifically. And that is how they wanted all houses done. They came in and said that. That was just the one time, the only time, I have heard anybody from [CH] tell us how to do–you know, how they wanted it done as far as just the backout, leveling walls. That is the only incident."

¶ 30 On the issue of safety, Miller testified to a requirement that he believed came ultimately from CH:

"Q. Are you aware of any instances where anyone from [CH] did anything with respect to correcting any safety issues with any [HC] crew members?

A. No. I mean, there was an incident–not an incident, but a requirement to put bracing in the windows if it was [*sic*] over four foot. I remember we weren't doing that, and then [CH] told [Hawkins] they wanted to start bracing off windows and–

Q. (Interrupting) When you say–

A. –doorways, and what do you call–stairwells, you know.

Q. When you say [CH] told [Hawkins], that is not a conversation that you were privy to?

A. I was not privy to.

Q. And so basically what you're referring to is at some point [Hawkins] told you that is how your practice was going to be?

A. Yes.

Q. And you presumed he spoke with [CH]?

A. I presumed he spoke with [CH] about the safety rails.

* * *

Q. [I]s that something that was done after this accident?

A. I believe it was before we did–started doing that.

Q. Are you sure one way or the other?

A. No, I'm not sure. Not 100 percent sure. It could have been after.

Q. It could be before, could be after?

A. It could be after, it could be before. I'm not 100 percent sure."

¶ 31    Miller believed that CH "could fire [HC] if [CH] didn't like the job that [HC] was doing." Also, HC would be obligated to follow any safety measures imposed by CH. Miller admitted, however, that he was unaware of the specific legal arrangement between CH and HC. Rather, Miller was "guessing" that, because CH was the general contractor on the job, "[a]ny of the rules that [HC] [was] told to follow *** were sent down from [CH]." The only dictate that Miller recalled coming directly from CH, however, was the wall-leveling requirement.

¶ 32    Plaintiff and his coworkers did not provide a unified account of plaintiff's fall. According to all but Miller, plaintiff fell when a truss being slid into place dislodged the lath board that was bracing the previously placed trusses, loosening the truss on which plaintiff was standing. According to Miller, the lath board was dislodged not because of a truss striking it, but because plaintiff leaned too much of his weight onto it.

¶ 33    Members of the HC crew also gave accounts of why a crane was not used at 407 Harvest Glenn to set trusses, and they offered opinions as to how a crane would have affected the truss setting. Plaintiff testified that, when he worked at several construction companies before his employment with HC, the crews set trusses with a crane even on one-story homes. This, according to plaintiff, was the "only OSHA-approved way." Plaintiff further recalled that HC used a crane to set trusses on all homes on which plaintiff had worked prior to 407 Harvest Glenn. Plaintiff could not recall, however, if those homes had at least two stories. As for 407 Harvest Glenn, plaintiff recalled Hawkins informing the crew that a crane would not be available for the home in time for the framing deadline. Thus, according to Hawkins, the crew would "have to do what [they] have to do." The crew was upset by the news. According to plaintiff, lifting trusses by hand is "awkward" and "create[s] the risk that the truss may become unstable and fall." A crane, on the other hand, enables the truss to be lifted in a "controlled and secure manner so you don't have this risk."

¶ 34    Jarman's account of why a crane was not used at 407 Harvest Glenn was closer to plaintiff's than was any other account. According to Jarman, Hawkins told the crew, on the morning that the trusses were to be delivered, that they " 'should be able to get a crane.' " Hawkins said that he would inquire with CH about a crane and report what he learned. Later, Taylor told the crew that Hawkins had said that a crane would not be available until the next day. The crew decided not to wait for a crane but to set the trusses by hand that day. According to Jarman, HC used a crane on "most" of its homes, but regarding 407 Harvest Glenn "it was easier and more cost-effective to hand the trusses up *** than to rent a crane." Asked if a crane could have prevented the accident, Jarman answered that, if a crane had been used, the trusses

would have been lowered from above and the crew would have been careful not to allow the lath board to overhang.

¶ 35     The accounts given by the other crew members diverged more sharply from plaintiff's. According to Taylor and Steines, Hawkins inquired of Taylor whether he believed that a crane was necessary to set the trusses. Taylor and Steines both recalled that the crew voted on whether to use a crane and decided against it. Taylor noted that plaintiff was in favor of, but "not crazy" about, setting the trusses by hand. According to both Taylor and Steines, HC would not normally use a crane on a 1,232-square-foot house such as 407 Harvest Glenn. Steines explained that it is simply "faster" to place the trusses by hand than to wait for a crane. Taylor could recall no occasion where HC used a crane on a house like 407 Harvest Glenn, but he believed that HC would use one if a "site condition," such as a sloping yard, required it or if HC already had a crane in the area. Steines, like Hawkins, believed that a crane could reduce the risk of striking an overhanging lath board.

¶ 36     Miller recalled that, on the day of the accident, a crane was on-site but then "went away." The crew "didn't need" the crane anyway because the trusses for the garage were light and, so, could be set by hand. According to Miller, HC's use of a crane depends on the size of the trusses. Given the generally smaller size of garage trusses, HC crews would set them by hand "most of the time." In Miller's view, the hand-setting of trusses on the garage at 407 Harvest Glenn was "normal procedure."

¶ 37     Testimony on many of the foregoing issues was also given by White, CH's expediter. White described expediters as "glorified waiters," who keep subcontractors stocked with materials, notify them when a worksite is ready for them, and check their work for compliance with specifications. White testified that, if he observed a subcontractor working unsafely, he would report it to his supervisor, Steve Burdick. White was uncertain, however, if CH had the authority to halt a subcontractor's work because of safety concerns or nonconformity to specifications. White could recall no instance where CH attempted to halt a subcontractor's work. White also could not recall observing any unsafe practices by subcontractors at the Harvest Glenn subdivision.

¶ 38     White further testified that he knew of no industry standard dictating when a crane must be used to set trusses. Rather, the framer has "discretion." White recalled that, when he did framing work with a prior employer, trusses were set by hand on one-story homes. In his position as expediter for CH, White was not involved with setting trusses and had no recollection of witnessing HC set trusses. White was also not involved in ordering cranes; to his knowledge, subcontractors ordered cranes on their own. White was not aware whether HC had requested a crane before plaintiff's accident.

¶ 39     Knabe, CH's vice president of development, testified that CH had no safety program governing subcontractors. CH also had no responsibility to enforce safety at worksites. When a subcontractor was at a worksite, safety was entirely its own responsibility. According to Knabe, HC's duty was to comply with project specifications, and "how [it] got to that point was up to [it]." CH "had no control" in that respect.

¶ 40     The trial court granted summary judgment for CH on both counts against it. On count I, the court found no evidence that CH exhibited control over HC's work sufficient to give rise to a duty under section 414. The court reasoned, first, that the Agreement was "clear that [HC] was fully and completely responsible for all aspects of its work as well as for safety on the project." Hawkins and Contarino both "clearly understood" the Agreement to mean such. Second, CH's

and HC's course of conduct was consistent with the Agreement, as there was "simply no evidence *** to suggest that anyone from [HC's] crew ever took direction from [CH] as to the means and methods of the work [HC] was to complete." Third, contrary to plaintiff's suggestion that CH's control of the crane constituted, in itself, retained control, the court found "it *** clear that [HC] had the option of requesting a crane to assist with the truss construction but chose not to do so."

¶ 41   The court noted plaintiff's reliance on *Wilkerson v. Paul Schwendener, Inc.*, 379 Ill. App. 3d 491 (2008), and found the case distinguishable. The court found *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201 (2005), cited by CH, more analogous to the facts at hand.

¶ 42   On count II, the court made the following conclusions from facts it found uncontested: (1) HC, not CH, had control of the worksite at 407 Harvest Glenn; (2) the accident stemmed not from a "condition on the land," but from a work practice, namely, setting trusses by hand; and (3) even if the setting of trusses by hand was a "condition on the land," CH neither knew nor reasonably should have known of the condition.

¶ 43   Plaintiff filed this timely appeal.

¶ 44                                   II. ANALYSIS
¶ 45                   A. Motion to Strike Part of Plaintiff's Reply Brief
¶ 46   We deal first with CH's motion to strike the entirety of section III of plaintiff's reply brief. CH argues as follows:

> "In section III of his reply brief, [plaintiff] argues that various OSHA violations occurred while [plaintiff] and his crew were setting the roof trusses at the time of his injury. [Plaintiff] argues that this supports his assertion that [CH] negligently retained control over safety, which supposedly caused his injury. [Plaintiff] argues that OSHA prohibited the setting of roof trusses without fall protection in place, required all trusses/rafters to be adequately braced before being used as a work support and that all work be done from a stable position, and required a fall protection plan to be in place prior to setting roof trusses by hand. [Citation.] According to [plaintiff], none of this was done, which supposedly supports his claim against [CH] under § 414 of the Restatement (Second) of Torts regarding retained control. ***
>
> *** [S]uch argument should be stricken because it was not made in [plaintiff's] opening brief."

¶ 47   Thus, CH contends that plaintiff never argued in his opening brief that the manner in which the HC crew was raising trusses violated OSHA. We grant the motion to strike, but only in part, for the following reasons.

¶ 48   First, we note that CH has accurately characterized the briefing. We begin with plaintiff's opening brief, the argument portion of which is divided into three sections. Section I of the argument concerns count I of the complaint (section 414–retained control) and is entitled:

> "I. The circuit court erred in finding that [CH] did not retain sufficient control to subject it to a duty pursuant to § 414 of the Restatement (Second) of Torts because [HC] was not free to perform the work in the manner of its choosing."

¶ 49   Consistent with this heading, plaintiff argues in section I that, contrary to the trial court's reasoning, there indeed was a factual dispute on whether CH retained control over HC's work so as to create a duty of care. Plaintiff argues no further element of negligence. In other words,

plaintiff does not, in addition to arguing that a duty of care existed, contend that CH breached that duty, *e.g.*, by permitting violations of OSHA or any other standard. Plaintiff does not argue that CH's duty had a particular scope or that CH's actions fell outside that scope. Language evocative of a claim of breach does, we acknowledge, appear in the following sentences in section I:

> "[CH] exercised its control by denying the use of the crane and therefore requiring [plaintiff] to work *unsafely* (and with no method of fall protection or protection plan in place). [Citation.] [Plaintiff] was not free to do the work in the manner he chose or with the *proper safety precautions*, due to [CH's] decision to deny use of the crane." (Emphasis added.)

These remarks do not, however, amount to a developed claim of breach, as plaintiff cites no law relating to that element of negligence. Nor, more to CH's point in its motion to strike, does plaintiff assert that HC's conduct violated any standard, such as OSHA.

¶ 50    Continuing on with plaintiff's opening brief, we note that section II of the argument concerns count II (section 343–dangerous condition) of plaintiff's complaint and is likewise confined to the issue of whether CH had a duty of care toward HC's employees. Specifically, plaintiff argues, as against the trial court's ruling, that CH did have possession of the land and that the dangerous condition on the land, per section 343, consisted of the precarious manner in which plaintiff and the crew were raising trusses.

¶ 51    In its appellee's brief, CH makes a common rejoinder to both arguments. First, as to plaintiff's argument on count I, CH asserts:

> "Hawkins never informed [CH] that it was unsafe for his workers to set trusses without the use of a crane. In fact, plaintiff was completely unable to provide any evidence to the effect that setting trusses without a crane was unsafe."

¶ 52    CH echoes this sentiment with respect to plaintiff's argument on count II:

> "[Plaintiff] does not even attempt to argue that it was an unsafe practice for [him] to stand in the middle of a roof truss while another roof truss is being set next to it, nor does he argue that fall protection was required under such circumstances."

¶ 53    Proceeding with plaintiff's reply brief, we note that section III is entitled, "OSHA required there to be a fall protection plan when installing roof trusses by hand." Plaintiff, in obvious reference to above-quoted remarks by CH, begins:

> "[CH] contends that [plaintiff] does not claim that an OSHA violation occurred and therefore evidence that [CH] required [HC] to comply with OSHA standards and whether or not a crane was made available to [HC] is irrelevant. This argument is disingenuous and specious. First of all, evidence of an OSHA violation is not required to bring a claim pursuant to § 414. However, the evidence in this case is that an OSHA violation did occur when [plaintiff] was performing the work of setting roof trusses by hand without any fall protection plan in place."

¶ 54    Plaintiff proceeds to cite what he believes is evidence of what OSHA required at the time of his accident. After this, plaintiff concludes the paragraph as follows:

> "Clearly[,] the work that [plaintiff] was performing was not only unsafe and hazardous, but in direct violation of OSHA standards requiring[,] at a minimum[,] a fall protection plan to be in place prior to beginning the work of setting roof trusses by hand."

¶ 55    In the next paragraph in section III, plaintiff cites his own deposition testimony that using a crane would have been a safer way to position the trusses. In the final paragraph, he cites evidence that CH was in control of whether a crane would be available for HC at 407 Harvest Glenn.

¶ 56    Returning to the substance of CH's motion to strike, we agree with plaintiff that the motion is properly interpreted to extend only to plaintiff's contention, in section III of his reply brief, that HC's setting the trusses without a crane and without fall protection contravened OSHA. The motion has merit as to the OSHA-based contention. As we have noted, plaintiff did *not* contend in his opening brief that HC's manner of raising trusses was in violation of OSHA or any other standard. "The reply brief, if any, shall be confined strictly to replying to arguments presented in the brief of the appellee ***." Ill. S. Ct. R. 341(j) (eff. Feb. 6, 2013). "Points not argued [in the opening brief] are waived and shall not be raised in the reply brief ***." Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); see also *Franciscan Communities, Inc. v. Hamer*, 2012 IL App (2d) 110431, ¶ 19 ("[A]rguments may not be raised for the first time in reply briefs.").

¶ 57    Plaintiff contends, however, that section III contains no new point, but is simply rebuttal. He points to four separate pages of his opening brief where, he claims, "facts are set forth regarding OSHA, the mandated OSHA safety training course, and [CH's] obligations pursuant to OSHA." The first three of these pages fall within the opening brief's statement of facts, where they were not woven into an argument–and indeed the supreme court rules prohibit argument in a statement of facts. See Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013). The final cited page, page 17, is in the argument and contains several record citations purported to show "examples of [CH's] control," one of which is (as described in the parenthetical that plaintiff provides after the citation) CH's requirement that HC comply with OSHA. However, plaintiff makes no attempt on page 17 to demonstrate what OSHA substantively requires, and so he does not develop any contention that OSHA prohibited the setting of trusses without a crane or fall protection. We agree with CH, therefore, that plaintiff makes no contention in his opening brief that HC's manner of setting the trusses on the day of the accident contravened OSHA. Accordingly, we strike that contention from plaintiff's reply brief.

¶ 58    We agree with plaintiff, however, that while the relief requested in CH's motion is the excision of section III in its entirety, the substance of the motion is directed only at the contention that OSHA was violated. The motion does not target plaintiff's other contentions in section III, *i.e.*, that CH controlled whether a crane was available at 407 Harvest Glenn and that a crane would have helped prevent the accident. Consequently, we deny the motion with respect to those contentions.

¶ 59                          B. The Striking of Fournier's Affidavit

¶ 60    Moving to the merits of the appeal, we address first plaintiff's claim that the trial court erred in striking Fournier's affidavit as noncompliant with Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013), which provides in relevant part:

>       "Affidavits in support of and in opposition to a motion for summary judgment *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto. If all of the

- 14 -

facts to be shown are not within the personal knowledge of one person, two or more affidavits shall be used."

¶ 61    There is no unanimity among appellate courts as to the proper standard for reviewing a motion to strike an affidavit for lack of compliance with Rule 191(a). Compare *American Service Insurance Co. v. China Ocean Shipping Co. (Americas), Inc.*, 402 Ill. App. 3d 513, 524 (1st Dist. 2010) (abuse of discretion standard), with *Jackson v. Graham*, 323 Ill. App. 3d 766, 773 (4th Dist. 2001) (*de novo* standard). We need not decide which standard to apply here, as under either standard we would affirm the trial court's decision.

¶ 62    Fournier's affidavit frequently references, as a basis for his opinions, "industry customs and practices" and CH's own "actions and customs and practice[s]." From these actions, customs, and practices, of which Fournier provides no detail, he concludes that CH had the "responsibility" to (1) "order that fall protection measures be utilized on [the] jobsite"; (2) "order that [HC] utilize scaffolds or ladders when performing truss installation"; and (3) "order that [HC] utilize a crane when performing truss installation." The trial court held that these and the remaining opinions in the affidavit were legal conclusions and, as such, infringed the court's province to determine issues of law. Rule 191(a), however, does not bar legal conclusions *per se*. See *Taylor v. City of Beardstown*, 142 Ill. App. 3d 584, 597 (1986) (no infringement of Rule 191(a) in affidavit of professor of nursing who opined that defendant's employees "met the standard of care applicable to nursing staffs in like hospitals under like circumstances"); see also Ill. R. Evid. 704 (eff. Jan. 1, 2011) ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). Rather, the rule simply bars any conclusion, legal or otherwise, for which the affiant provides no specific factual support. See *Northrop v. Lopatka*, 242 Ill. App. 3d 1, 7 (1993) (affidavit improper because affiant reached a "legal conclusion" that the standard of care was breached "without reciting any facts showing a breach"). Fournier's conclusions that we have designated (1) through (3) are insufficient under Rule 191(a) because Fournier does not specify the facts underlying them. See *Kosten v. St. Anne's Hospital*, 132 Ill. App. 3d 1073, 1079 (1985) ("conclusions that are unsupported by specific facts" do not meet the requirements of Rule 191(a)).

¶ 63    The following paragraphs contain the only specific facts in the affidavit. We italicize those facts to distinguish them from the conclusions that Fournier draws therefrom:

"16. In this case [CH] had the responsibility based on its actions and customs and practice[s] to employ a competent superintendent on this jobsite. *[CH's] expediters in practice acted as superintendents and would visit the jobsite daily, providing materials and inspecting work.* [CH] failed to ensure that a competent superintendent was on the jobsite.

17. In this case [CH] had the responsibility based on its actions and customs and practice[s] to initiate, maintain and supervise all safety precautions. [CH] failed to initiate, maintain and supervise all safety precautions.

18. [CH] was aware of the fact that [plaintiff] and others were working at heights above 6 feet without any fall protection systems in place.

19. The practice on the Harvest Glenn jobsite of working above 6 feet without any fall protection plan in place created an obvious fall hazard.

20. [CH] had notice of the obvious fall hazard of [plaintiff] and others working above 6 feet without fall protection. They were aware of this unsafe work practice through their own observations of the work being performed.

21. It was unreasonable for [CH] as a general contractor to fail to take the necessary safety precautions to correct the unsafe work practice of working above 6 feet without any fall protection plan in place." (Emphasis added.)

¶ 64 Paragraphs 16 through 21 were also properly stricken. Fournier's conclusion in these paragraphs, that CH failed to discharge its responsibility of supervision, depends on three main premises. The first two are representations of fact: (1) plaintiff and others were working at heights above six feet without fall protection and (2) CH, through its expediters, was aware that HC's employees were working in this manner. The third premise is that CH was responsible for safety at HC's worksite. Unlike the former two, this is itself a conclusion, and Fournier appears to have in mind three possible sources for it. The first is his factual representation that CH employed expediters to provide materials for HC and to inspect its work. Fournier fails, however, to specify how the expediters' work, so described, translated to a duty to ensure safety as well. The second candidate consists of CH's "actions and customs and practice[s]," but again, because these are unspecified, they are inadequate under Rule 191(a) to support the conclusion that Fournier reaches. The third candidate is cited in paragraph 22:

"22. In this case [CH] had the responsibility based on its actions and customs and practice[s] including, but not limited to[,] the following provisions of OSHA: [citing several specific sections of OSHA]. Also [CH] was negligent in not complying with OSHA instruction STD 3-.01.A to address safety concerns at the Harvest Glenn jobsite including installing trusses at heights above 6 feet. Mr. Fournier will also rely on the following provisions from the American Institute of Architects' General Conditions of the Contract for Construction A 201 § 3.3; § 3.9; § 5.3; and Article 10. This means that it was [CH's] duty to ensure that [HC's] employees including [plaintiff] were utilizing a fall protection plan while placing trusses at a height above 6 feet at the time that [plaintiff] was injured. [CH] failed to ensure that such a fall protection plan was in place."

Fournier attached the referenced documents to his affidavit. He neglected, however, to indicate how they guided him to his conclusion. Paragraph 22, therefore, is out of compliance with Rule 191(a) because it "fails to set forth the facts, as opposed to merely the sources, on which [the] conclusion is based." *Old Second National Bank of Aurora v. Aurora Township*, 156 Ill. App. 3d 62, 67 (1987) (affidavit identifying various sources and stating bare conclusions therefrom was properly stricken).

¶ 65 For the foregoing reasons, we hold that, whether assessed for an abuse of discretion or reviewed *de novo*, the trial court's decision to strike Fournier's affidavit was not erroneous.

¶ 66                                    C. The Summary Judgment Ruling
¶ 67                                        1. General Principles
¶ 68 We now turn to the question of whether the trial court erred in granting summary judgment on counts I and II.

¶ 69 The purpose of summary judgment is to determine whether a genuine issue of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment is

appropriate where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Id.* at 43; see 735 ILCS 5/2-1005(c) (West 2012). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the nonmovant. *Adams*, 211 Ill. 2d at 43. Since summary judgment is a drastic remedy, it should be granted only when the right of the movant is clear and free from doubt. *Id.* Review of a trial court's grant of summary judgment is *de novo*. *Id.*

¶ 70  To succeed on a negligence claim, the plaintiff must plead and prove that the defendant (1) owed the plaintiff a duty of care, (2) breached that duty, and (3) proximately caused injury to the plaintiff. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 19. On appeal, plaintiff identifies two bases on which CH allegedly had a duty of care.

¶ 71                                    2. Count I–Retained Control

¶ 72  In most cases, a general contractor that retains a subcontractor is not liable for the subcontractor's negligence toward its employees. *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 340 (2008). The reason is that, generally, the general contractor does not supervise the details of the subcontractor's work and, hence, is not properly positioned to prevent negligence, whereas the subcontractor has asserted the right to monitor and direct the details of its employees' work. *Id.* Where, however, the general contractor supervises the subcontractor and its employees as to the details of its work, the general contractor can be liable for the subcontractor's acts or omissions resulting in injury to its employees. The contours of this principle are stated in section 414 of the Restatement (Second) of Torts, adopted by Illinois courts. See *Larson*, 33 Ill. 2d at 325 (adopting section 414).

¶ 73  Section 414 states:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

This is the so-called "retained control" ground for liability. Comment *a* to section 414 contrasts liability under that section with liability under the law of agency:

> "*a*. If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." *Id.* cmt. a.

¶ 74    Comment *c* clarifies the threshold of control that must exist for a duty of care to arise under section 414:

> "*c*. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* cmt. c.

¶ 75    Hence, a duty of care arises under section 414 if the general contractor controls not only the "desired ends" but also the "incidental aspects" of the subcontractor's work. *Downs*, 358 Ill. App. 3d at 207-08.

¶ 76    "The best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists." *Id.* at 205.

¶ 77    The Agreement unequivocally vests the "Subcontractor," HC, with full discretion as to construction techniques and also renders safety its responsibility alone. Specifically, the contract (1) denies CH "contractual, operational and/or supervisory control over and/or charge of [HC's] Work"; (2) accords HC sole responsibility "for construction means, methods, techniques, sequences, procedures, operatives details and incidental aspects of [HC's] Work"; and (3) makes HC "fully and solely responsible for the jobsite safety at the Project."

¶ 78    The foregoing language is entirety antithetical to any suggestion that CH retained control over HC. Plaintiff does not dispute the obvious import of this language, but attempts through other routes to evade the effect. First, plaintiff claims that both signatories, Contarino and Hawkins, "testified at their depositions that they did not understand the significance of the contract provisions." Here plaintiff points to Contarino's testimony, when asked about various phrases in sections 4.00 and 5.00 of the Agreement, that he did not know what the language meant "in a legal setting." Plaintiff also points to Hawkins' testimony that he spent less than five minutes reviewing the Agreement–essentially "skimm[ing]" it–before signing it and that he did not consult anyone as to its meaning beforehand. Plaintiff relies as well on the following exchange in Hawkins' deposition:

> "Q. Did you understand exactly what was meant *** by where it says, 'The contractor shall not have contractual, operational and/or supervisory control over and/or charge of the work and shall not be'–actually, that portion. Do you understand exactly what that meant?
>
> ***
>
> A. Yeah.
>
> BY MR. MURRAY (plaintiff's attorney):
>
> Q. What exactly does it mean to have operational control?
>
> A. Well, if [*sic*] he can kick me off the job if he chooses.
>
> Q. So you understand that [*sic*] operational control to mean that Joe Contarino could kick you off the job if he chooses?
>
> * * *

- 18 -

A. Well, he does have the right to–if he sees I'm not doing the job right, he can fire me or, you know–

BY MR. MURRAY:

Q. And my only question is–

A. –pull me off to the side and say, You're not doing it right, you know.

Q. And my question to you is, is that what you understood when you see 'operational' in this contract to mean?

* * *

A. *** What I get from that is I'm in charge of how the–you know, the way the job goes and it's up to me on, you know, the safety guidelines, how the house is framed and, you know, he–but Joe–contractor–

Hold on, what I understand is he has control but doesn't have control.

Q. What do you mean by that?

A. Like it's my jobsite, you know, but I'm working for him[,] for the developer[,] so his word is what I go by, you know.

Q. And was that your understanding when you signed this contract?

A. Yeah, but I–whenever I signed the contract, it's–you know, if I'm not doing something right, I know somebody's going to let me know."

¶ 79        From the foregoing portions of Contarino's and Hawkins' testimony, plaintiff concludes:

> "Clearly, this contract was not understood by either party and it does not demonstrate any meeting of the minds as to who was to control safety. Under these facts, this subcontract certainly should not control a duty analysis."

¶ 80        Plaintiff's contention is difficult to ascertain. He cites Hawkins' interpretation of the Agreement to prove that there was no meeting of the minds, but then cites no testimony from Contarino to suggest that he understood the Agreement differently. Perhaps plaintiff's point is that Hawkins' interpretation is so at variance with the plain import of the Agreement that he cannot be said to have assented to its terms. This would be ironic, since Hawkins' interpretation as conveyed in the exchange above appears to support plaintiff's case for retained control–only because the exchange appears to assume the opposite of what the Agreement states, which is that CH shall *not* have "operational and/or supervisory control" over HC's work.

¶ 81        Before laboring further to understand the contention, we note that plaintiff cites no authority for it in his opening brief. Consequently, we would be justified in finding the point forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("argument" in the appellant's opening brief shall include citation to pertinent authority, and any point not made in the opening brief is forfeited). Even if we addressed the contention, and considered the authority cited in the reply brief, we would reject the point on the merits. In his reply brief, plaintiff cites, without providing any context, the appellate court's remark in *Lynge v. Kunstmann*, 94 Ill. App. 3d 689, 694 (1981), that "questions of intent are particularly inappropriate for summary judgment." Plaintiff thus contends in his reply brief that it was "improper for the trial court to find as a matter of law that Mr. Contarino and Mr. Hawkins understood the contract and had a meeting of the minds." The proposition from *Lynge*, however, does not support plaintiff's argument.

¶ 82     The plaintiffs in *Lynge* sued to enforce a real estate contract, and the issue on appeal was whether and when the contract arose during the course of communications that followed the plaintiffs' offer to purchase. The appellate court determined that, since the contract did not specify what would constitute acceptance, extrinsic evidence was necessary to ascertain the parties' intent. *Id.* at 694-96.

¶ 83     *Lynge* is faithful to the well-established principle that "there is a disputed fact precluding summary judgment when a material writing contains an ambiguity which requires the admission of extrinsic evidence." *Old Kent Bank-St. Charles N.A. v. Surwood Corp.*, 256 Ill. App. 3d 221, 228 (1994). The corollary is that "where the intent of the parties may be ascertained from the plain language of the contract, no disputed issue of fact exists." *Id.* Hence, contrary to what the language from *Lynge* might suggest when divorced from its context, contract interpretation is appropriate for summary judgment, depending on the circumstances. See *Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 266 Ill. App. 3d 1070, 1080 (1994). In *Lynge*, an ambiguity in the contract language justified the resort to extrinsic evidence. Here, however, plaintiff makes no attempt to identify any ambiguity in the language of the Agreement and thereby establish that the Agreement's meaning is not a pure question of law. Consequently, we fail to see how *Lynge* militates against summary judgment here.

¶ 84     We are quick to add, however, that a party's interpretation of the contract governing the relationship between a general contractor and a subcontractor can be admissible in a section 414 case even where there is no ambiguity in the contract. Retained control may be demonstrated by evidence of a course of conduct at variance with the governing contract. See *Downs*, 358 Ill. App. 3d at 206-07 ("It is possible that a duty to a subcontractor's employee may be created by the contractor's actions undertaken in contravention of, or in the absence of, an agreement."); see also *Wilkerson*, 379 Ill. App. 3d at 497; *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1064 (2000). A party's interpretation of the contract can be admissible as explaining a course of conduct, but the interpretation must not be allowed to undermine the plain meaning of the contract terms.

¶ 85     Plaintiff's next point regarding the language of the Agreement is that CH exercised control by (as plaintiff phrases it) "requir[ing] [HC] to comply with OSHA when performing work." We are not convinced. The exact language in the Agreement is that HC "shall be solely responsible for compliance" with OSHA. This language could be, first, a disclaimer of what would otherwise be joint responsibility for compliance with OSHA, or, alternatively, an assignment from CH to HC of responsibility that HC would not otherwise have had. Plaintiff does not clarify which is the case, but in fact neither alternative helps him. If HC was already bound by OSHA, we hardly see how CH's disclaimer of *its* liability could constitute retained control. Moreover, even if the contract imposed new regulatory liability upon HC, any control would stem from OSHA, not from CH. Finally, even if we were prepared to treat OSHA regulation as an indicium of retained control by CH, plaintiff's argument would be incomplete. Section 414 contemplates a "continuum of control" (*Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 314 (2004)), but plaintiff fails to demonstrate the extent to which OSHA regulated HC's work. Plaintiff does attempt to elucidate a portion of OSHA, namely, as it governs the setting of trusses, but the effort, not made until the reply brief, comes too late, and the point is thereby forfeited. *Supra* ¶ 57.

¶ 86     Our inquiry does not end with the Agreement, no matter how strongly its language stands against plaintiff's position. As noted, a court can find retained control despite the contract

- 20 -

language if the parties' course of conduct demonstrates such control. See *Downs*, 358 Ill. App. 3d at 206-07; see also *Wilkerson*, 379 Ill. App. 3d at 497; *Bokodi*, 312 Ill. App. 3d at 1064. Plaintiff submits that, even if the contract language is not in his favor, there at least is a question of material fact whether CH's and HC's dealings belied the terms of the contract and established retained control by CH. According to plaintiff, CH displayed the requisite control in two main spheres: (1) work safety; and (2) work means and methods. CH makes a common response to both suggestions. First, CH denies that it had a duty of care under the facts at hand. Second, and alternatively, CH contends that plaintiff does not–at least in his opening brief–point to any facts suggesting that CH breached its duty of care, at least as plaintiff has framed that duty on appeal. We agree on both scores.

¶ 87    On whether a duty of care existed, we first determine whether CH exhibited retained control with respect to work safety at 407 Harvest Glenn. This control was manifested, plaintiff claims, in these ways: (1) "[CH] had the authority to stop the work of [HC's] crew if it felt [HC] was working in an unsafe manner"; (2) "[CH] would not allow its subcontractors to perform work without the proper safety equipment and would require its subcontractors to get the proper equipment to perform their job safely"; and (3) "[HC] was required to follow all [CH] safety guidelines and measures when performing [its] work."

¶ 88    Plaintiff, however, is unable to identify any specific safety measure that CH imposed on HC. We previously explained (*supra* ¶ 85) that plaintiff has failed to establish that CH's requiring HC to comply with OSHA was an indicium of retained control.

¶ 89    Plaintiff, however, claims that the evidence shows that "[CH] required [HC] to install the roof trusses in accordance with the truss package–which set forth exact methods and procedures for how to install the roof trusses." Plaintiff cites Hawkins' and Contarino's testimony, but these sources lend absolutely no support to this representation. On the pages to which plaintiff directs us, Hawkins acknowledges that the trusses came with instructions and that he would occasionally "glance [at them] and see if there was anything new." The cited testimony from Contarino does not address the truss instructions at all. There is simply no suggestion on these pages that CH required HC to comply with the truss instructions. We admonish plaintiff's counsel that we expect accurate representations of the record.

¶ 90    Plaintiff also cites Miller's testimony that Hawkins required HC's crews to place safety rails across openings. (Hawkins also testified to a similar safety measure, attributing it to OSHA.) For several reasons, however, Miller's testimony does not suffice to create a material fact question as to retained control.

¶ 91    First, Miller acknowledged that he only "presumed" that the requirement of safety rails came from CH. We note plaintiff's reliance on Miller's testimony that (in plaintiff's paraphrase) "any of the rules that [HC's] crew was told to follow were sent down from [CH]." Miller admitted, however, that this affirmation was a "guess" based on the authority he supposed CH to possess as the general contractor and that he was unaware of the legal relationship between CH and HC regarding the Harvest Glenn project.

¶ 92    Second, when pressed to recall when Hawkins announced the safety-rail requirement, Miller was ultimately noncommittal on whether the declaration came before or after the accident: "It could be after, it could be before. I'm not 100 percent sure." Since Miller could not temporally localize the requirement, his testimony fails as evidence of retained control existing when plaintiff was injured.

¶ 93     Third, even assuming that the requirement of safety rails was imposed by CH *and* was in effect when the accident occurred, the requirement would not have established retained control, even in combination with the other evidence upon which plaintiff relies. That additional evidence consists of generalized testimony from the deponents about CH's authority to govern HC's work. First, there was testimony about the topic of safety. Contarino testified that CH expected HC to obtain all necessary safety equipment. Also, Hawkins was repeatedly queried about CH's "authority" to impose safety measures. The questions periodically identified specific measures, such as the use of scaffolding or safety harnesses in raising trusses. While the questioner and Hawkins might have had different senses of "authority" in mind at times, the overall thrust of Hawkins' testimony was that HC had liberty to rebuff CH's demands for such safety measures, but would agree to them in order "to keep working for [CH]." It is not clear, however, if Hawkins believed that CH's recourse under these circumstances included terminating the Agreement or if he assumed that CH would have to allow HC to complete its work under the Agreement and could thereafter decline any further business relations with HC. After all, the Agreement denied CH "contractual, operational and/or supervisory control over and/or charge of the Work" and made safety HC's responsibility alone. Elsewhere in his testimony, Hawkins affirmed that, on his reading, the Agreement gave HC sole discretion over the means of construction and sole responsibility for safety. Plaintiff has not persuaded us that Hawkins departed from this unequivocal understanding of the Agreement.

¶ 94     Some of the deponents testified more broadly about CH's control over HC's work. Plaintiff points to his testimony that he believed that all aspects of HC's work were dictated by CH. Specifically, plaintiff stated that he "always figures that the chain of command comes from the general contractor down *** and [Hawkins] is doing exactly what he's being told by the general contractor." Upon further questioning, plaintiff admitted that his belief was based on industry custom and that he never saw the Agreement or was aware of any occasion when CH dictated to HC the means or methods of construction.

¶ 95     Miller also made a broad affirmation about CH's authority, but as we noted (*supra* ¶ 91), he admitted that his testimony was based on assumptions and not on the specific legal relationship between HC and CH.

¶ 96     Taylor opined that, since Contarino owned the land at 407 Harvest Glenn, he had "ultimate control," *i.e.*, "control over everything that happens," and so had "authority to tell [subcontractors] what to do." Taylor, however, admitted that he did not know what Contarino's or CH's "legal duties, obligations or authorities were" with respect to HC.

¶ 97     Even if we accorded the foregoing evidence the full significance plaintiff desires, the evidence would still not create a genuine issue of material fact, as compared to the circumstances in the authorities on which plaintiff relies: *Bokodi*, *Wilkerson*, and *Aguirre v. Turner Construction Co.*, 501 F.3d 825 (7th Cir. 2007). In all three cases, the court reversed summary judgment in favor of the general contractor, finding an issue of material fact as to whether the general contractor exhibited retained control. In each case, the general contractor exercised control to a far greater degree than CH exercised here.

¶ 98     In *Bokodi*, the appellate court commented that the general contractor "went to great lengths to control the safety standards at the work site." *Bokodi*, 312 Ill. App. 3d at 1063. In its written agreement with the subcontractor, the general contractor specified 29 different safety measures and procedures with which the subcontractor was required to comply. The subcontractor was

required to conduct weekly safety meetings, which the general contractor had the right to monitor. Also, the general contractor employed a full-time safety manager to walk the worksite checking for safety compliance. The safety manager, indeed all of the general contractor's employees, were authorized to halt the work of the subcontractor if they observed it to be unsafe. The suspension of work could continue until the safety problem was remedied to the general contractor's satisfaction. The *Bokodi* court distinguished *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916 (1994), in a passage that provides a concise and accurate summary of the facts in *Fris*:

> "In *Fris*, the [general contractor's] project engineer testified that, under the contract, the independent contractors were responsible for their own means, methods, and techniques of completing their work. The independent contractor was responsible for the safety of its project. While the project engineer testified that the [general contractor] retained authority to stop work which was unsafe, there was no mention that the [general contractor] actively inspected the site for compliance with any safety guidelines. There is also no evidence that the [general contractor] in *Fris* had a specific safety program in effect. In the present case, defendants established their own safety program and appointed an individual whose sole function was to seek out safety hazards. Thus, defendants in the present case took a much more active role in controlling and supervising the safety standards at the jobsite than the [general contractor] in *Fris*." *Bokodi*, 312 Ill. App. 3d at 1062.

¶ 99     In *Wilkerson*, the contract required the subcontractor to: "(1) comply with a list of 21 safety regulations prepared by [the general contractor]; (2) hold weekly safety meetings and submit minutes of those meetings to [the general contractor]; (3) prepare and submit to [the general contractor] for approval a 'site specific safety plan'; and (4) attend [the general contractor's] weekly safety-related meetings." *Wilkerson*, 379 Ill. App. 3d at 494. Additionally, the general contractor "had three supervisory employees on-site with discretionary authority to stop [the subcontractor's work] if the work was being performed in a dangerous manner." *Id.* The record contained documentation of an instance where the general contractor halted the subcontractor's work for failure to comply with the general contractor's safety regulations. *Id.* at 494-95. The appellate court found ample evidence that the general contractor "retained more than a general right of supervision." *Id.* at 497.

¶ 100     The *Wilkerson* court relied on *Bokodi* and found *Joyce v. Mastri*, 371 Ill. App. 3d 64 (2007), readily distinguishable. In *Joyce*, as in *Fris*, the general contractor's site managers had the right to halt a subcontractor's work if they observed safety hazards, but the general contractor did not actively inspect for safety or require the subcontractor to comply with the general contractor's own safety rules. The *Joyce* court held that the general contractor retained at most a general right of supervision and that its authority on safety matters did not impact the incidental aspects of the subcontractor's work. *Id.* at 75.

¶ 101     In *Aguirre*, the plaintiff, the subcontractor's employee, fell from a scaffold. The subcontractor agreement provided that the subcontractor would be solely responsible for safety at the worksite. Nevertheless, the general contractor was substantially active in ensuring safety. First, the general contractor required all of its subcontractors to comply with its 125-page safety program, which included 23 rules specific to scaffold construction. *Aguirre*, 501 F.3d at 827. Second, the general contractor held monthly safety meetings, required subcontractors to hold their own regular safety meetings that the general contractor could

monitor, and required subcontractors to prepare their own site-specific safety programs. *Id.* Third, the general contractor's employees surveyed the worksite daily to monitor compliance with safety requirements, and the general contractor possessed, and occasionally exercised, the authority to halt any subcontractor work being performed in an unsafe manner. *Id.* Also, the general contractor inspected many of its subcontractors' scaffolds. Prior to the accident, the scaffold from which the plaintiff fell had been altered from the standard design at the general contractor's directive. *Id.*

¶ 102    The Seventh Circuit Court of Appeals, likening the facts before it to *Bokodi*, found an issue of material fact whether the general contractor "retained sufficient control over the safety of scaffolding design and construction to give rise to a duty of reasonable care." *Id.* at 831.

¶ 103    Cited in *Aguirre*, *Ross v. Dae Julie, Inc.*, 341 Ill. App. 3d 1065 (2003), reinforces the line drawn in the foregoing cases between a general right of supervision and an active system for safety enforcement. The appellate court in *Ross* affirmed summary judgment in the general contractor's favor. The general contractor's project manager testified that he had the authority to stop a subcontractor's work if he felt that it was dangerous. About a month before the accident, the project manager informed the subcontractor of the need for fall protection, and the subcontractor assured him that it would handle the matter. The manager testified that he relied on the subcontractor's expertise in doing its job properly and that it was responsible for the safety of its employees. *Id.* at 1067-68. Of the manager's testimony that he had voiced to the subcontractor a general concern about safety and had the authority to halt the subcontractor's work for safety reasons, the court said, citing *Fris*:

> "[S]uch a general right to ensure that safety precautions are observed and that work is done in a safe manner will not impose liability on the general contractor unless the evidence shows that the general contractor retained control over the means and methods of the independent contractor's work." *Id.* at 1071 (citing *Fris*, 255 Ill. App. 3d at 924).

¶ 104    The present case is more similar to *Joyce*, *Ross*, and *Fris* than to *Bokodi*, *Wilkerson*, and *Aguirre*. Unlike the general contractors in the latter three cases, CH did not promulgate a body of safety rules for subcontractors to follow. The only evidence of a specific safety standard imposed by CH was Miller's description of a safety-rail requirement, but even if we overlook the infirmities in his testimony, there would stand only one safety measure compared to the multiple measures in *Bokodi* (29 measures), *Wilkerson* (21 measures), and *Aguirre* (a 125-page safety manual with 23 rules specifically applicable to scaffolding, the instrumentality that the plaintiff was using when he fell).

¶ 105    Moreover, unlike the general contractors in those cases, CH had no employee specifically charged with monitoring safety at the worksite and authorized to halt unsafe work practices. As consistently described by the deponents, the responsibilities of CH's expediters included supplying subcontractors with materials, monitoring progress, and checking for compliance with project specifications. Safety monitoring was not also enumerated. White, the only expediter to testify, asserted that he would report unsafe practices to his superior, but he never identified safety enforcement as among his official duties and was unsure whether CH had authority to halt subcontractor work because of safety concerns. We note that Miller's anecdote about the safety rails also suggests some expediter consciousness of safety, but even if we overlooked the serious problems with that testimony, there would be nothing approaching the systematic safety programs in *Bokodi* and the other decisions. Moreover,

plaintiff's and Miller's claims that CH dictated all of HC's practices (including, presumably, safety-related ones) were, they admitted, based on assumptions, not on the actual relationship between HC and CH. Taylor, who made a similar statement about CH's authority, admitted that he was unaware of CH's legal rights with respect to HC.

¶ 106      There are, we recognize, abundant suggestions in the record that CH had a right to halt unsafe work practices. Further, Contarino testified that CH required HC to use all "necessary" safety equipment. The contours of those rights, however, were never defined. Under *Joyce*, *Ross*, and *Fris*, a general right to enforce safety does not amount to retained control. Therefore, plaintiff has failed to convince us that a genuine question of material fact exists whether CH's control over safety gave rise to a duty of care.

¶ 107      Next, plaintiff claims that a duty of care arose because CH regulated construction processes and techniques. First, he cites Miller's recollection of a single occasion when a CH expediter dictated to HC's crew "a requirement that the walls be leveled a certain way." Miller believed that it was "stupid *** how [CH] wanted it done." Miller testified that the expediter's directive predated "this project," by which he meant, presumably, 407 Harvest Glenn.

¶ 108      Plaintiff cites no case recognizing a duty of care based on a single instance of control unrelated to the activity in which the plaintiff was injured. *Cf. Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶¶ 126, 143 (affirming jury finding of liability under section 414 based on evidence that the general contractor exhibited retained control by barring mechanical dragging of roofing materials, which "result[ed] in the workers' manually pushing [the materials]," during which the plaintiff was injured); *Fancher v. Central Illinois Public Service Co.*, 279 Ill. App. 3d 530, 538-39 (1996) (reversing dismissal of complaint where the plaintiff alleged that the general contractor dictated the subcontractor's means of cleaning a silo and that the decedent died while cleaning according to that method). While liability under section 414 may be found where the general contractor "retains the control of *any part* of the work," there is also the requirement that the injury be "caused by [the] failure to exercise [the] control with reasonable care." (Emphasis added.) Restatement (Second) of Torts § 414 (1965). We do not attempt today to draw the boundaries of liability under section 414. Our point is simply that plaintiff provides no authority by which CH's control over window leveling, taken alone, can be deemed to establish control over truss raising.

¶ 109      As evidence of CH's broader control over construction means and methods, plaintiff relies on his, Taylor's, and Miller's sweeping statements about CH's authority, but as we have determined (*supra* ¶¶ 91, 105), their assertions were admittedly based on assumptions from either property ownership or industry custom and not on the particular legal arrangement between CH and HC. Plaintiff also relies on Hawkins' testimony that, hypothetically, HC would comply with CH's requests for specific construction methods, because HC wanted "to keep working for [CH]." As noted, however, it is unclear if Hawkins meant, contrary to the substance of his testimony elsewhere in his deposition, that CH would have had the right to terminate the Agreement if HC refused to adopt the measures.

¶ 110      Finally, we discuss the one case that plaintiff cites in claiming that CH exhibited retained control by regulating the use of construction equipment. Plaintiff cites *Garcia v. Wooton Construction, Ltd.*, 387 Ill. App. 3d 497 (2008), arguing that CH's control over providing a crane gave rise to a duty of care.

¶ 111      The appellate court in *Garcia* reversed summary judgment in favor of the defendant, Wooton Construction Co., the general contractor on a condominium construction project.

Wooton retained Zalk Josephs Fabricators, L.L.C., to fabricate the structural steel for the job. Zalk in turn retained JP Cullen & Sons to erect the structural steel. The written agreement between Wooton and Zalk, which was incorporated into the agreement between Zalk and Cullen, stated that Wooton would provide a crane. The plaintiff, an employee of Cullen, was injured while manually unloading kegs of bolts from the basket of a crane. In reversing the summary judgment, the appellate court relied on the following evidence. Both on the day of the injury and previously on the project, Wooton controlled which subcontractor would use the crane and for how long. Before the day of the accident, a Cullen employee complained to Wooton that the unavailability of the crane was placing Cullen employees at risk of injury. The employee referred specifically to an object he was forced to move by hand in the absence of the crane. On the day of the accident, Cullen's "raising gang," which included the plaintiff, was using the crane to unload kegs of bolts (each keg weighing between 100 and 200 pounds) from a crane basket when Wooton's superintendent approached and announced that Wooton was taking the crane and would return it after lunch. The plaintiff's foreman then directed the plaintiff to unload the kegs by hand before the lunch break so that the crane could be relinquished. While he was unloading the kegs, the plaintiff injured his back. The evidence established (in the appellate court's words) that "the safe and customary practice in the steel-raising industry was to use the crane to remove multiple kegs of bolts from a transporting basket." *Id.* at 506. Moreover, Wooton acknowledged on appeal that it was " 'standard practice in the steel erection industry to load and unload kegs of bolts with the use of a crane.' " *Id.*

¶ 112    Based on the foregoing evidence, the appellate court found summary judgment improper:

"We understand the gravamen of the plaintiff's claim to be that Wooton, in controlling the use of the crane, had a duty to exercise reasonable care in taking the crane from use by Cullen. In other words, before Wooton removed the crane from the Cullen raising gang, Wooton had a duty to ensure that the raising gang had completed its crane-dependent work. More specifically, because the safe and customary practice in the steel-raising industry was to use the crane to remove multiple kegs of bolts from a transporting basket, Wooton should have made clear at the time it announced the 'taking' of the crane that Cullen complete the unloading of the basket with the crane before relinquishing the crane to Wooton. With Wooton assuming control over the only crane at the work site and in light of the conceded need for the use of the crane for the raising gang to perform its work, it follows that Wooton retained some degree of control over the manner in which the work of the Cullen raising gang was done. [Citation.]" *Id.*

¶ 113    Plaintiff analogizes the present case to *Garcia* by pointing to his testimony that CH declined HC's request for a crane for the truss work at 407 Harvest Glenn. CH, for its part, submits that *Garcia* is distinguishable because (1) HC never complained to CH that it was unsafe for HC's workers to set trusses without a crane; and (2) plaintiff's opening brief identifies no "evidence to the effect that setting trusses without a crane was unsafe." The latter remark essentially asks us to affirm on the ground that, even if CH had a duty of care, plaintiff has failed to establish a question of material fact that the scope of CH's duty of care included the provision of a crane–in other words, that CH's failure to provide a crane was a breach of its duty. Notably, plaintiff identifies on appeal no manner in which CH may have been negligent other than by failing to provide a crane. Consequently, plaintiff's entire appeal on the section 414 issue fails if it is procedurally proper for us to affirm on the crane issue.

¶ 114　　　We acknowledge, foremost, that the parties did not argue the element of breach below. The narrow concern of the summary judgment proceedings was whether CH owed *any* duty of care, not whether it owed a duty of a particular scope or whether it breached any duty. Plaintiff's argument on appeal is correspondingly narrow. While that focus might be understandable, we are not constrained by what the trial court decided or even by what it was asked to decide. " 'While an appellant who fails to raise an issue in the trial court waives that issue, an appellee might raise an issue on review that was not presented to the trial court in order to sustain the judgment, as long as the factual basis for the issue was before the trial court.' " *Cooney v. Magnabosco*, 407 Ill. App. 3d 264, 268 (2011) (quoting *DOD Technologies v. Mesirow Insurance Services, Inc.*, 381 Ill. App. 3d 1042, 1050 (2008)). We have recapitulated the extensive evidence submitted below on the role of cranes in setting trusses. Multiple witnesses testified as to CH's policy on providing cranes to subcontractors performing truss work, HC's practice regarding using cranes for truss work, and the need, or lack thereof, for a crane at 407 Harvest Glenn. There is an abundant factual basis for affirming on the issue of breach.

¶ 115　　　CH is correct that plaintiff's opening brief does not attempt to establish that CH's duty of care, if it existed, required provision of a crane. As we explained above (*supra* ¶ 49), plaintiff's remarks on the alleged danger of setting trusses by hand are merely ancillary to an argument focused on proving the error of the trial court's holding that no duty existed in the first instance. Plaintiff attempts in his reply brief to broaden the point to include whether CH should have provided a crane. The effort is untimely, however, and so the point is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued [in the opening brief] are waived and shall not be raised in the reply brief ***.").

¶ 116　　　Even if we forgave the forfeiture and considered what plaintiff presents in his reply brief, we would still affirm, as plaintiff has not established there a standard of care that required provision of a crane. While other deponents testified to the usefulness of a crane in truss work, plaintiff cites here simply his own testimony that raising a truss by hand is awkward and risky and that a crane will reduce or eliminate the danger of a dislodged truss. However, in negligence actions against professionals or members of skilled trades, expert opinion is normally necessary to establish the standard of care. See *Colburn v. Mario Tricoci Hair Salon & Day Spas, Inc.*, 2012 IL App (2d) 110624, ¶ 37 (summary judgment proceeding). Plaintiff does not acknowledge this rule, much less argue for the application of its narrow exceptions. Presumably, it was in recognition of this standard that plaintiff submitted Fournier's affidavit, but that document was properly stricken. *Supra* ¶¶ 59-65.

¶ 117　　　This fatal defect aside, the facts at hand are not on par with *Garcia*, plaintiff's sole authority. In *Garcia*, though no expert opinion was submitted, there at least was testimony as to industry practice. Here, none of the witnesses claimed to know of any industry practice regarding cranes. Plaintiff testified that OSHA required a crane for truss work, but he did not elaborate, and, in any event, we have stricken plaintiff's contention that OSHA disallowed the manner in which HC was raising trusses when plaintiff was injured. *Supra* ¶ 57.

¶ 118　　　To summarize, we hold that the undisputed material facts establish that (1) CH owed no duty of care under the retained control exception of section 414; and (2) at the very least, any such duty of care would not have required providing HC with a crane to perform the truss work at 407 Harvest Glenn.

¶ 119　　　　　　　　　　　3. Count II–Dangerous Condition on the Land

¶ 120    "An owner or possessor of land owes its invitees a common law duty of reasonable care to maintain its premises in a reasonably safe condition [citation], but no legal duty arises unless the harm is reasonably foreseeable [citation]." *Gregory v. Beazer East*, 384 Ill. App. 3d 178, 191 (2008). Section 343 states the duty more precisely:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
>> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>>
>> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>>
>> (c) fails to exercise reasonable care to protect them against the danger."
>
> Restatement (Second) of Torts § 343 (1965).

¶ 121    Disputing the trial court's finding that CH was not a "possessor" of the land, plaintiff states in his opening brief that there are "several Illinois cases where a defendant general contractor, like [CH], has been found to be a possessor of land on a construction site." Plaintiff lists *Wilkerson*, *Diebert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430 (1990), and *Clifford v. Wharton Business Group, L.L.C.*, 353 Ill. App. 3d 34 (2004). The problem for plaintiff is that, while those cases indeed concerned general contractors, their status as "possessor[s] of land" was never made an issue in any of them. Therefore, contrary to plaintiff's representation, none of the general contractors in those cases was "found" to be a possessor of the land. Above, we admonished plaintiff's counsel for taking liberties with the record (*supra* ¶ 89); we now admonish counsel for taking liberties with case law.

¶ 122    As plaintiff's opening brief cites no apposite authority on the issue of possession, we would be justified in finding the point forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("argument" in the appellant's opening brief shall include citation to pertinent authority, and any point not made in the opening brief is forfeited). Nonetheless, we address what plaintiff provides in his reply brief on the issue of possession. He cites *Williams v. Sebert Landscape Co.*, 407 Ill. App. 3d 753, 756 (2011), for the following statements:

> "The law in Illinois is that in order for a defendant to be an owner-occupier or possessor of land, he must occupy or possess the land with the intent to control it. [Citations.] The concept of 'control' is closely tied with the ability to exclude people from the use of a piece of property or to direct how that property is to be used."

¶ 123    Plaintiff claims that CH's status as a possessor of the land was evident because CH "controlled access to [407 Harvest Glenn]." Here plaintiff cites the following exchange from Hawkins' deposition testimony:

> "Q. Did you understand exactly what was meant *** by where it says, 'The contractor shall not have contractual, operational and/or supervisory control over and/or charge of the work and shall not be'–actually, that portion. Do you understand exactly what that meant?
>
> ***
>
> A. Yeah.
>
> BY MR. MURRAY (plaintiff's attorney):
>
> Q. What exactly does it mean to have operational control?

A. Well, if [*sic*] he can kick me off the job if he chooses.

Q. So you understand that [*sic*] operational control to mean that Joe Contarino could kick you off the job if he chooses?

\* \* \*

A. Well, he does have the right to–if he sees I'm not doing the job right, he can fire me \*\*\*."

Opposing counsel at the deposition objected that this line of questioning was based on a false premise. Indeed, it was: the Agreement unequivocally provides that *CH*, not *HC*, lacks "operational and/or supervisory control" over HC's work. Hawkins' answers are, therefore, of no pertinence, and we are, frankly, mystified as to why plaintiff would think otherwise.

¶ 124 Plaintiff also believes that, on the issue of possession, it is significant that CH "had unfettered access" to 407 Harvest Glenn. He cites Hawkins' testimony that CH "had free access to come to the property and look at the work [HC] was performing." Plaintiff, however, has not drawn a connection between CH's access to the property and its ability to exclude others or regulate their use of the property. We note that, at the time of construction, 407 Harvest Glenn was owned by Harvest Glenn LLC, not CH. These entities had a common owner in Contarino, but Harvest Glenn LLC had two additional owners.

¶ 125 To summarize, even if we overlooked plaintiff's forfeiture of the issue of whether CH was a "possessor" of the land on which the accident occurred, plaintiff's argument still fails on the merits. Consequently, we find no error in the trial court's grant of summary judgment on count II of plaintiff's complaint.

¶ 126                                      III. CONCLUSION

¶ 127 For the foregoing reasons, we affirm the decision of the circuit court of Winnebago County granting summary judgment on counts I and II of plaintiff's complaint.

¶ 128 Affirmed.